Wilma BEHYMER, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of Social Security Administration, Defendant.

No. Civ. 1:98cv186.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

March 11, 1999.

Joseph W Shull, Fort Wayne, IN, for Wilma Behymer, plaintiff.

Deborah M Leonard, United States Attorneys Office, Fort Wayne, IN, for Social Security Administration, Kenneth S. Apfel, Commissioner of Social Security, defendant.

### *ORDER*

COSBEY, United States Magistrate Judge.

This matter is before the court[1] for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying plaintiff's application for disability insurance benefits (DIB) as provided for in the Social Security Act. 42 U.S.C. § 416(i); 42 U.S.C. § 423; 42 U.S.C. § 1381. Section 205(g) of the Act provides, *inter alia*, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g).

 The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are de-

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

monstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). It is not enough for plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff,* 307 F.2d 840 (4th Cir.1962), *cert. denied,* 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963); *Garcia v. Califano,* 463 F.Supp. 1098 (N.D.Ill.1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson,* 445 F.2d 36 (7th Cir.1971); *Kutchman v. Cohen,* 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker,* 732 F.2d 605, 607 (7th Cir.1984) *citing Whitney v. Schweiker,* 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler,* 737 F.2d 714, 715 (7th Cir.1984) quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *see Allen v. Weinberger,* 552 F.2d 781, 784 (7th Cir.1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. § 405(g), unless there has been an error of law." *Garfield, supra* at 607; *see also Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir.1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge made the following findings:

1. The claimant met the disability insured status requirements of the Act on July 1, 1997, the date the claimant stated she became unable to work, and continues to meet them through December 31, 1992, but not thereafter.

2. The claimant has not engaged in substantial gainful activity since her alleged date of disability onset.

3. The medical evidence establishes that the claimant has severe arthritis, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective allegations of pain and other symptomatology are not fully credible as set forth in the body of this decision.

5. The claimant has the residual functional capacity to perform work related activities except for work involving lifting and/or carrying no more than 10 pounds occasionally.

6. The claimant's past relevant work as production worker, as she performed it, did not require the performance of work related activities precluded by the above limitation(s) (20 C.F.R. § 404.1545).

7. The claimant's impairment does not prevent the claimant from performing her past relevant work.

8. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date last insured (20 C.F.R. § 404.1520(e)).

Based upon those findings, the Administrative Law Judge ("ALJ") determined that the plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review on April 28, 1998. This appeal followed.

The plaintiff filed her opening brief on November 3, 1998. On January 20, 1999, the defendant filed a memorandum in support of the Commissioner's decision, and on February 1, 1999, the plaintiff filed her reply. Upon full review of the record in this cause, this court is of the view that the Commissioner's conclusion is not supported by substantial evidence and accordingly, this case will be remanded to the ALJ for further proceedings.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen,* 841 F.2d 710, 711 (7th Cir.1988); *Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen,* 855 F.2d 503, 504 n. 2 (7th Cir.1988); *Zalewski v. Heckler,* 760 F.2d 160, 162 n. 2 (7th Cir.1985); *accord Halvorsen v. Heckler,* 743 F.2d 1221 (7th Cir.1984). From the nature of the ALJ's decision to deny benefits, it is clear that step four was the determinative inquiry.

The plaintiff most recently applied for DIB on May 3, 1996, alleging disability since July 1, 1987. This application was denied at both the initial and reconsideration stages of administrative review. The plaintiff requested a hearing and one was held before ALJ Bryan J. Bernstein on May 20, 1997. In a decision dated July 16, 1997, the ALJ found that the plaintiff has severe arthritis, an impairment that did not meet or equal any impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings). The ALJ further determined that the plaintiff could perform her past relevant work, and was therefore not disabled. The plaintiff petitioned the Appeals Council for review of the ALJ's decision and the Appeals Council issued a decision dated April 28, 1998 which upheld the decision of the ALJ and became the final decision of the Commissioner.

The plaintiff must establish that she was under a disability that began on or before December 31, 1992. The plaintiff alleges that she was disabled as of July 1, 1987. The plaintiff was born on July 29, 1951. Thus, at the time of her alleged onset of disability she was 45 years old, and at the time of her date last insured (DLI) she was 51 years old.

The plaintiff had worked as a production worker which was classified as unskilled light work as performed in the economy and as unskilled sedentary work as she performed it. She had also worked as a short order cook which was classified as semi-skilled light work both as performed in the economy and as she performed it.

*Plaintiff's Physical Impairments*

The plaintiff has a past history of renal disease that goes back to 1972 when, because of renal failure, she was started on hemodialysis. After a short period of dialysis, she received a living related donor transplant from her mother that functioned well for one year. She returned to hemodialysis, and a cadaver kidney was transplanted which functioned well until March 1981 when it had to be removed and she went back again to hemodialysis. On July 1, 1981 a successful operation was performed transplanting another cadaveric kidney to her.

The plaintiff has been treated since at least January 12, 1987 by Dr. Steven D. McMurray, a nephrologist. According to Dr. McMurray, her transplanted kidney has functioned well; however, he states that the plaintiff has suffered significant problems in the form of severe bone disease and depression. The first mention of musculoskeletal pain in the record is in a January 12, 1987 clinical note of Dr. McMurray which indicates that the plaintiff's pain had improved but her back was still sore and exercises were discussed. A bit over a year later, on January 22, 1988, the plaintiff called Dr. McMurray com-

plaining of back pain for three weeks which caused pain across her shoulder and into her head. The plaintiff was prescribed Darvocet N 100. On February 22, 1988, the plaintiff had a major complaint regarding burning and stinging on the bottom of both feet up to the knees and also her right knee was giving out. The plaintiff was prescribed Clinoril, and she was also sent for an x-ray of her right knee and an EMG of her lower leg. The plaintiff saw Dr. McMurray and followed up on March 28, 1988, and he noted the knee x-ray and EMG were both normal. The plaintiff reported that she could walk a block, and Dr. McMurray thought she seemed to be improved with Clinoril which he prescribed again.

On August 25, 1988, the plaintiff was still complaining of stinging in her feet, and Dr. McMurray noted that she had symptoms of claudication. Dr. McMurray also noted that Clinoril had occasionally helped the plaintiff. On September 18, 1988 the plaintiff complained of difficulty sleeping, pain in her right hip, and soreness in the legs. On December 14, 1989, Dr. McMurray noted that the plaintiff's joints remained a problem. On March 1, 1990, the plaintiff complained to Dr. McMurray of severe headaches with diaphoresis and chilling. On physical exam the plaintiff had pain with flexing. The doctor ordered x-rays of the cervical spine, lumbosacral spine, and head. An x-ray of March 2, 1990 of the plaintiff's lumbosacral spine showed degenerative changes, lateral subluxation at L1–2 with the loss of joint space at this level most pronounced anteriorly, and the suggestion of some distribution of the anterior end-plate of L1 on the lateral view which may be degenerative or post traumatic. X-rays of the plaintiff's cervical spine of March 2, 1990 showed early mild degenerative changes centered at the C5–6 level. The CT scan of the plaintiff's head was normal.

On March 2, 1990, the plaintiff called the doctor's office stating that her headaches were better which she thought were related to her back pain, and Clinoril was prescribed. On March 9, 1990, Dr. McMurray's office called the plaintiff, and she indicated that the Clinoril was helping her back pain if she did not "over do it"; however, she was still having headaches which were now bearable. On March 27, 1990, the plaintiff saw Dr. McMurray in his office and she complained of headaches. Dr. McMurray decided to refer the plaintiff to a neurologist and orthopedic doctor.

In a letter to neurologist, Stanley D. Wissman, M.D., of March 28, 1990, Dr. McMurray noted that he treated the plaintiff's low back pain with Clinoril, heat, and so on without relief; moreover the plaintiff was unable to take codeine well and Talwin had caused her severe nightmares. Dr. McMurray further noted that the plaintiff was taking Demerol presently every six hours for pain. Dr. McMurray also noted that he found no evidence of increased intracerebral pressure in regards to her headaches; however, since she was on immunosuppressive drugs for quite some time he was slightly concerned about a central nervous system infection. The plaintiff was apparently seen by Dr. Porter, a neurologist, on March 30, 1990, but there is no record of the results of this evaluation.

On April 4, 1990, the plaintiff saw Dr. Alan McGee, an orthopedic physician. The plaintiff complained of mid-lumbar and lower lumbar back pain over the last 9 to 10 years which had become progressively worse over the past year and especially the last 6 months as the pain was getting to the point that it was nearly unbearable. A physical examination of the plaintiff's spine did not reveal any gross abnormalities; however, there was a very mild right thoracal lumbar scoliosis. The plaintiff was tender to percussion at the L–1 level and also at the L4–5 level. The plaintiff flexed forward to 80 degrees without difficulty, but she did have some pain in the upper lumbar spine on extension. The plaintiff had good lateral bending and rotation. Strength in all muscle groups of the

lower extremities were normal, and deep tendon reflexes in the patella and Achilles areas were 2+/4+ bilaterally. Dr. McGee noted that x-rays of the lumbar spine showed marked degenerative changes in the L1–2 disc space with marked narrowing along with destruction of the anterior inferior endplate of L–1 and anterior superior endplate of L–2 with marked surrounding bony sclerosis. Dr. McGee found that the plaintiff definitely had some upper lumbar spine instability which was causing her pain; however he was also concerned that this was more than a degenerative process because she had been on chronic steroids and there may have been some infectious process involved or a metastatic lesion. As a result, Dr. McGee ordered a bone scan and a MRI of the lumbar spine. A MRI of the lumbosacral spine of April 13, 1990 showed narrowing and degenerative disc disease at L1–2. A bone scan done on April 13, 1990 was normal.

On April 16, 1990, the plaintiff saw Dr. McGee again and he noted that both the MRI and bone scan showed degenerative changes at L1–2. The plaintiff continued to complain of intermittent pain mostly in her lumbosacral area. On physical examination the plaintiff was tender but there was no other significant physical findings. Dr. McGee indicated that he was not sure what the cause of the pain was, but he placed the plaintiff in a lumbosacral corset and continued her on the same medicine as ordered by Dr. McMurray. The plaintiff saw Dr. McGee again on May 9, 1990, and she still had low back pain located mainly in the lower lumbar segments. The plaintiff also complained of some thoracic pain on arms.motions in front of her and she had some muscle spasms in the thoracic spine.

On May 9, 1990, the plaintiff called Dr. McMurray's office still complaining of back pain and stating that she needed more medicines or something done. On May 10, 1990, the plaintiff saw Dr. McMurray still complaining of back pain. Dr. McMurray noted that Dr. McGee was negative regarding surgical treatment at this time.

On June 6, 1990, the plaintiff saw Dr. McGee, and she reported that her back was somewhat better but still uncomfortable. The plaintiff was wearing a corset and doing her back stretching and strengthening exercises. Dr. McGee indicated that the plaintiff was to continue these on an as tolerated basis and walk as tolerated. On June 7, 1990 the plaintiff saw Dr. McMurray and indicated that her back was better. On October 4, 1990; the plaintiff saw Dr. McMurray and indicated that her back remained a major problem. On her next visit on February 4, 1991, the plaintiff was still having problems with her bones and back. On August 5, 1991, the plaintiff continued to report major problems with her joints and back. On March 23, 1992, a MRI of the cervical spine was done which showed degenerative disc disease at C5–6, posterior bony spurring at C5–6 and foraminal stenosis at C5–6 on the left. On August 6, 1992, Dr. McMurray reported that the plaintiff's joints remained a problem.

On July 12, 1993, the plaintiff reported to Dr. McMurray that her back continued to be a problem, and she was using a heating pad to help relieve her pain. On September 12, 1994, the plaintiff continued to have headaches and back pain. On February 3, 1995, the plaintiff reported that she continued to have joint pains and her medications were changed. On November 20, 1995, Dr. McMurray wrote a letter to Dr. Bryce Treadwell, and he reported that the plaintiff continued to have problems with joint discomfort, joint pain, and all the things that she had for quite sometime. Dr. McMurray noted that Lovtaren was not helping and that the plaintiff was getting heartburn.

On June 5, 1996, the plaintiff complained of pain across her back and waist area around into the abdomen. The plaintiff reported that the pain shot down into her hip and it hurt to walk. On June 6, 1996, an x-ray of the thoracic spine showed mild

compression deformity of the approximate T–10 vertebral body with an indeterminate age, and progressing degenerative changes at the L1–2 level secondary to malposition. The plaintiff saw Dr. McMurray on the same day the above studies were done, and she reported having lots of pain in her back. Based on the results of the x-rays and the examination, Dr. McMurray decided to refer the plaintiff to Dr. McGee. On June 6, 1996, the plaintiff saw Dr. McGee and reported a month long history of severe thoracolumbar pain with some pain in her buttocks and down into her legs with numbness and tingling. The plaintiff also reported difficulty getting up from a sitting position. On exam, the plaintiff had spasms in the thoracolumbar spine. An x-ray was done that day which showed some previous diskitis with auto-fusion at L1–2 and an apparent new compression fracture at T–10. Dr. McGee's impression was that her pain was probably caused by the compression fracture at T–10. An MRI done on June 11, 1996 showed minor thoracic compression deformities.

On June 17, 1996, the plaintiff saw Dr. McGee again and he was of the opinion that the compression fractures of the plaintiff's thoracic spine was the cause of her back pain. Dr. McGee advised that there was not much more he could do for her other than have her wear the Jewett hyperextension brace until the pain subsided over the next few months. On September 26, 1996, the plaintiff saw Dr. McMurray with continued problems with her joints, legs, and muscle pains to the point that she was almost unable to walk.

On September 30, 1996, the plaintiff saw Dr. Leonard Mastbaum, and endocrinologist. Dr. Mastbaum noted a history of approximately 3–inch height loss, vertebral fracture, and complaints of knee and back pain of five years duration. A DEXA Bone Densitometry was done which showed values compatible with osteopenia. The studies suggest the possibility of prior compression fractures. Dr. Mastbaum noted that the x-rays suggest the possibility that the plaintiff might have more serious osteoporosis of the spine than the DEXA data indicated.

*Plaintiff's Mental Impairments*

The first report regarding depression in the record is a note of January 12, 1987, simply indicating that the plaintiff is less depressed. Dr. McMurray prescribed Prozac on December 14, 1989. On March 1, 1990, Dr. McMurray noted that the Prozac was helping the plaintiff's depression. On May 10, 1990, Dr. McMurray indicated that the Prozac was to be continued.

The plaintiff was hospitalized from November 4, 1991 through November 6, 1991, at Dekalb Memorial Hospital for what was believed to be an allergic reaction to nuts. In the admissions history, Dr. Bryce Treadwell reported that the plaintiff was having some occasional depression secondary to her kidney transplant and her Cortisone, and the plaintiff was on Prozac for these problems which were "well controlled". After this hospitalization, the plaintiff saw Dr. McMurray on November 29, 1991, and she reported two episodes of dizziness, shortness of breath, and problems getting breath. The plaintiff reported that Prozac had been stopped and now depressive symptoms were returning. Dr. McMurray noted that the plaintiff was having panic attacks and would not go out of the house. Dr. McMurray continued Prozac and Xanax. The plaintiff was also sent for cardiology consultation, and the results were generally normal.

On November 4, 1992, Dr. McMurray noted that the plaintiff needed to go back on an anti-depressive, and he prescribed Zoloft. On March 2, 1994, the plaintiff again reported depression and Zoloft was continued. On November 20, 1995 she reported to Dr. McMurray that she was very depressed due to problems with her stepfather, and he prescribed Elavil and Zoloft. On December 27, 1995, Dr. McMurray prescribed Valium and Xanax.

Dr. Daniel Hauschild, a psychologist, reported that the plaintiff presented with

crying spells, severely depressed affect and mood, developing agoraphobia, and both homicidal and suicidal ideation. He indicated that depressive symptoms were precipitated by the death of the plaintiff's mother on the past New Year's Eve and were heightened by her ill feelings towards her step-father due to abuse towards her mother. Hospitalization was discussed on a number of occasions, but the plaintiff had been unwilling to do so. The plaintiff had been treated with Tranxene, Amitripyline, and Zoloft.

Dr. Hauschild reported that the plaintiff suffered from an acute decompensation which was apparently an exacerbation of long-standing difficulties. He noted that the plaintiff was in a serious auto accident about eight years ago, where relatives that she encouraged to come along were seriously injured. He noted that the plaintiff had suffered from Post Traumatic Stress Disorder since that time, including severe self-injurious behavior—*i.e.,* picking small chunks of skin off her arms with nail clippers, to the extent that her arms were covered in scar tissue. The plaintiff also reported dissociative rages on rare occasions where she became overwhelmed with anger and took it out on someone without any recall of her actions following the incident. Dr. Herbert Trier, a psychologist, confirms this report. Dr. Trier confirms that the plaintiff has had serious psychopathology dating back at least to 1988.

Dr. Trier and Dr. Hauschild administered the MMPI-II. The plaintiff's response patterns suggested that she may have answered items in the last part in a *random and careless manner which invali-*dated that portion of the test. The test was scored based on the first two-thirds of the test; however, the interpreted report of the results stated that caution should be taken in interpreting the results of the test. The profile was determined to be valid, and the plaintiff was described as cooperating and admitting a number of psychological problems in a frank and open manner. In regard to interpersonal rela-tions the test indicated that she was highly introverted and interpersonally avoidant and was very uneasy in close interpersonal involvement which appeared to be of long-standing duration. Diagnostic consideration suggested by the results of the test were Dysthymic Disorder or Anxiety Disorder and Dependent or Compulsive Personality Disorder.

*Legal Analysis*

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The agency has promulgated regulations that set forth a five-step sequential process for analyzing disability claims. 20 C.F.R. §§ 404.1520, 416.920. A claimant has the joint burdens of production and persuasion through at least step four, where the individual's residual functional capacity (RFC) is determined. *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. §§ 404.1545, 416.945. In the present case, the ALJ found that the plaintiff retained the ability to perform her past relevant work.

The agency's final decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that the agency findings "as to any fact, if supported by substantial evidence, shall be conclusive." "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Furthermore, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or on the [Commissioner's] designate, the ALJ)." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987) (citations omitted). This court must accept the

**662**

ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ. *Delgado v. Bowen,* 782 F.2d 79, 82 (7th Cir.1986).

The plaintiff argues that the ALJ improperly evaluated her subjective complaints, and incorrectly imposed a requirement of objective verification to a reasonable degree of certainty. Under the Social Security regulations a two-step process is used in evaluating subjective symptoms such as pain that a claimant alleges, and this process requires the following:

> [F]irst the presence of a medically determinable impairment which could reasonably be expected to produce the pain and other symptoms and second, that when such an impairment is established, allegations about the intensity and persistence of the pain or other symptoms must be considered in evaluating the impairment and its effect on the individual's capacity for work. 56 FR57 991 November 14, 1991.

■ The ALJ conceded that the first step was met by the claimant in that she did produce objective evidence that provided support for the existence of a condition likely to cause some pain and limitation prior to her date last insured. ALJ Decision at 5. However, the ALJ found that the plaintiff failed at the second step because her pain did not limit her functioning to the extent that she alleged. *Id.* Specifically, the ALJ found that although the plaintiff's daily activities were fairly limited, two factors weighed against considering them as strong evidence. First, the daily activities could not be objectively verified with any reasonable degree of certainty. Second, even if the daily activities were true as alleged, the degree of limitation cannot be attributed to her medical condition as opposed to other reasons due to relatively weak medical evidence and other factors. *Id.*

■ The plaintiff argues that the ALJ's first argument imposes a requirement which is not contained in the statute, regulations, rulings, or case law. The plaintiff points out that the Social Security regulations have long recognized the importance of a claimant's daily activities in disability determinations and determining the extent to which an individual's pain limits his functioning. Further, the plaintiff notes that it is clearly permissible for an ALJ to discredit the testimony of a claimant regarding her symptomology where the claimant is able to perform household chores and other activities that involve many of the same physical tasks as particular types of work. *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989); *Rousey v. Heckler,* 771 F.2d 1065, 1070 (7th Cir. 1985); *Reynolds v. Bowen,* 844 F.2d 451, 455 (7th Cir.1988). However, although the ALJ can choose to disbelieve testimony for the reasons set forth in the regulations, etc., objective verifiability to a reasonable degree of certainty is not a requirement imposed by law.

The Commissioner has failed to respond to the plaintiff's argument that the ALJ imposed an extra legal requirement of proof upon her which was not contained in the statute, regulations, rulings, or case law. This court finds that the ALJ used an incorrect standard to evaluate the plaintiff's symptoms. This error of law requires that the case be remanded for further consideration and application of the correct legal standards. *Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir.1980).

Next, the plaintiff argues that even though the ALJ opines that the medical evidence is relatively weak, he fails to give any specific reasons supporting his finding. The plaintiff argues that the regulations do not require objective medical evidence to corroborate statements about the intensity, persistence, and functional effects of pain or other symptoms, and the ALJ cannot reject the plaintiff's statements solely because the available objective medical evidence does not substantiate these state-

ments. *See Pope v. Shalala,* 998 F.2d 473, 482 (7th Cir.1993).

Again, the Commissioner has failed to respond to the plaintiff's argument. In the absence of specific reasons as to why the ALJ found the medical evidence "too weak", this court is unable to undertake a meaningful appellate review. *Rohan v. Chater,* 98 f.3d 966, 971 (7th Cir.1996).

In addition to stating that the medical evidence is "too weak", the ALJ also gave several other reasons why he believed the plaintiff's daily activities do not limit her to the extent she alleged. First, the ALJ reasoned that the plaintiff can still do her past work because she stopped working for reasons other than her medical problems and there was no evidence of a significant deterioration in her medical condition prior to the date last insured. The plaintiff argues that this reason does not build an accurate and logical bridge between the evidence and the results. The plaintiff acknowledges that although she was having difficulties doing her job before her layoff, she did not quit work because of her medical condition. However, the plaintiff contends that her medical condition did deteriorate prior to her date last insured, December 31, 1992. The plaintiff points to x-ray evidence that she had mild degenerative changes in her neck at C5–6 in March of 1990 (Tr. 290), and also that the strength of her pain medicine was increased from 1998 through 1990. Additionally, the headaches that the plaintiff attributed to her back pain became especially bad in March 1990, and the plaintiff reported to Dr. McGee that her back pain had reached the point where it was nearly unbearable. The x-ray of March 2, 1990 showed degenerative changes of the lumbosacral spine, lateral subluxation at L1–2 with the loss of joint space at the level most pronounced anteriorly and the suggestion of some distribution of the anteri-

or-plate of L1 on the lateral view which may be degenerative or post-traumatic.

The ALJ also opined that since the plaintiff filed for and received unemployment benefits after the alleged onset date of her disability, then she is capable of working. The plaintiff, however, correctly points out that even if the filing for unemployment benefits was conclusive proof that she could work back in 1987, it is no evidence at all concerning what her functional limitations were on December 31, 1992, the date last insured.

The ALJ also reasoned that the plaintiff did not view herself as disabled because in August of 1987 she requested that Dr. McMurray remove her fistula[2] from her forearm because prospective employers would not hire her out of fear that it would accidentally be severed and the plaintiff would bleed to death. Again, the plaintiff argues that events in 1987 have no relevance as to whether she was able to work on December 31, 1992. The Commissioner apparently concedes this argument, as he did not address it in his brief.

Lastly, the ALJ discounted the testimony of the plaintiff's sister, Patricia Springfield, simply because, as a sister, she was undoubtedly biased. Descriptions of friends and family members who were in a position to observe the claimant's symptoms and daily activities have been routinely accepted as competent evidence. *Sprague v. Bowen,* 812 F.2d 1226, 1232 (9th Cir.1987); 20 CFR § 404.1529(c)(3). A disregard for such evidence violates the Commissioner's regulations about observations by nonmedical sources as to how an impairment affects a claimant's ability to work. *Id.* When an ALJ fails to believe lay testimony about a claimant's allegations of pain or other symptoms, he should discuss the testimony specifically and make explicit credibility determinations. *Smith v. Heckler,* 735 F.2d 312, 313 (8th Cir.1984).

**2.** "[A] surgically created arteriovenous connection that provides a site of access for hemodialysis tubing." W.B. Saunders Co., *Dorland's Illustrated Medical Dictionary,* 635 (28th ed.1994).

The plaintiff argues that if an ALJ has only to say that a witness is a friend or relative of the claimant and is therefore presumed to be biased, then there would be no need ever to take such testimony and 20 C.F.R. § 404.1529(c)(3) would be null and void. This court agrees with the plaintiff that without some showing from the record that the testimony of a relative is biased or not credible, the mere fact that the witness is a relative is not enough to reject the testimony.

Next, the plaintiff argues that the ALJ improperly found that she does not have a severe mental impairment. In response, the Commissioner points out that the record shows that the plaintiff's depression was "well controlled" with medication. However, the Commissioner does not discuss plaintiff's argument that with mental impairments an individual's level of functioning may vary considerably over time and thus proper evaluation of the impairment must take into account the variations in the level of functioning over time. Additionally, the plaintiff argues that merely because the symptoms are controlled does not mean that an individual is not functionally limited, especially in a work environment. Finally, the plaintiff notes that the ALJ incorrectly stated in his decision that the plaintiff did not report taking medication for depression at the time of the hearing, and thus incorrectly concluded that the plaintiff's depression was "situational and temporary." Decision at 4. The transcript of the hearing clearly shows that the plaintiff did inform the ALJ that she was taking anti-depressant medication at the time of the hearing. (Tr. 375–76). The Commissioner has not disputed (or even mentioned) this fact in his brief.

In light of all of the above shortcomings in the ALJ's decision, this court will remand for further proceedings, as the plaintiff has requested.

*Conclusion*

For all of the foregoing reasons, the ALJ's decision is hereby REMANDED FOR FURTHER PROCEEDINGS.