GREGORY, Circuit Judge,
concurring in part and dissenting in part.
I agree with my good colleagues that the hypothetical questions submitted to the vocational expert were flawed, so the vocational expert’s testimony cannot serve to support a finding that Morgan is not disabled. However, I must respectfully dissent from the remainder of the majority opinion.
I.
The ALJ discounted Dr. Holford’s opinion by finding that, “I give greater weight to the results of [the FCE’s] actual testing than I do the opinion of Dr. Holford, especially in light of Dr. Kirkley’s opinion.” Tr. 15. Morgan challenges this, and I agree that it materially misapplies the Commissioner’s regulations and is not supported by substantial evidence.
The majority, instead, ignores the bulk of medical evidence Dr. Holford submitted and suggests that only a few select statements are at issue here. It then dismisses three of the four selected statements as legal opinions. This misses the forest for the trees: the record contains notes Dr. Holford submitted from some 19 visits, replete with medical impressions and opinions about Morgan’s condition. The majority then claims that any remaining discounting of Dr. Holford’s medical opinions was at best harmless error because it was similar to the FCE. This cannot be correct.
A.
From the majority opinion one would never know the full range of medical evidence Dr. Holford submitted in this case. From his records in the district court transcript (“Tr.”) we learn the following: After an emergency room visit and several examinations, on April 5, 2000 Dr. Holford found Morgan in “a lot of pain” and diagnosed her with a “C5-6 disc and spondylolisthesis at C6-7,” Tr. at 308. On April 18, 2000, he removed her C5-6 and C6-7 discs and fused her vertebrae from C5 through C7 with anterior plating. Dr. Holford prescribed medication and directed therapeutic exercises. By the end of May, he concluded that Morgan was doing “fair” and could return to light work in about four weeks. Tr. 303. Dr. Holford continued to see Morgan throughout that summer and prescribed medication and more exercises.
Morgan’s pain did not abate. In fact, after trying to grab an item that fell off of a shelf, she returned to the emergency room on June 17, 2000. She still performed light work, but complained of pain in her shoulders. On August 30, 2000, Dr. Holford noted that after squatting to stock a shelf at work, Morgan had developed lower back pain which radiated into her left leg. An x-ray revealed “degenerative *726 changes of the lumbar spine, mainly at 3^4 and at the thoracal lumbar junction.” Tr. 298. His impression was that Morgan suffered from sciatica and degenerative disc disease and he prescribed medication. On September 20, 2000 Dr. Holford felt that Morgan could gradually increase to working 40 hours per week with moderate duties. By late January of 2001, however, Morgan still complained bitterly of pain and tenderness in her back and neck. On January 30, 2001, Dr. Holford tested her range of motion and found “demonstrable weakness” in several areas. Tr. 296. He ordered an MRI.[1] On February 19, 2001, Dr. Holford noted that the MRI revealed multiple degenerative discs. Dr. Holford felt Morgan’s job, which included “bending and stooping while trying to protect her [surgically repaired] neck probably aggravated a pre-existing condition.” Tr. 295. He set up more tests.[2]
On March 20, 2001, Morgan returned to Dr. Holford, who reviewed the new tests, found Morgan with pain and tenderness in her back, diagnosed her with radiculopathy and axonal neuropathy, recommended epidural steroids, and kept her off of work. Dr. Holford stated that her “[prognosis is guarded,” Tr. 294, and noted that she may qualify for disability for neck and lumbar spine disease. The steroids evidently offered some short-term aid, but Morgan still experienced pain. By April 18, 2001, Dr. Holford found that Morgan had reached maximum medical improvement and had a “permanent impairment,” but could possibly do “modified duty” for a 4-hour day if it involved intermittent standing, sitting and twisting. Tr. 293.[3]
Dr. Holford also recommended the FCE and, on August 15, 2001, reviewed it. He observed that she was “up and down,” Tr. 292, and noted that Morgan’s FCE “basically figures that she can’t work a total of an 8 hour day.[4] She can’t work for more than 4 hours.” Id. He thought that Morgan qualified for disability “under cervical and lumbar disc disease. She has an inability to sit, bend, stoop, or twist long enough to work in an 8 hour day.” Id. Later, on January 28, 2002, Dr. Holford again noted Morgan’s back and neck pain and prescribed more medication. After a March 14, 2002 final evaluation, he indicated that Morgan “[s]till hurts quite a bit[,]” and had difficulty bending, stooping, twisting, straightening, and lifting. Tr. 317. He found that she had reached maximum medical improvement and that she would have difficulty sitting or standing for a five-hour day. He also stated that “I think she qualifies for disability.” Id.
All this, of course, is significantly different from the conclusory assertions the majority selects and dismisses. Merely because Dr. Holford at one point made some legal conclusions does not, of course, poi *727 son the many other medical opinions. And the striking picture painted by Dr. Holford’s medical impressions and opinions simply cannot be ignored.
B.
An examining physician’s opinions are given more weight than the opinion of one who has not examined the claimant, 20 C.F.R. § 404.1527(d)(1), and a treating physician’s opinion is especially valuable because such doctors
are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairments) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.
Id. § 404.1527(d)(2). This subsection of the regulations goes on to explain that:
If we find that a treating source’s opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your ease record, we will give it controlling weight.
Id. Even when a treating physician’s opinion is not given “controlling” weight it can still receive much more weight than other classes of evidence: “When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source’s opinion more weight than we would give it if it were from a nontreating source.” Id. § 404.1527(d)(2)(I). Further,
the more knowledge a treating source has about your impairment(s) the more weight we will give to the source’s medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.
Id. § 404.1527(d)(2)(h); see Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir.2001) (explaining § 404.1527(d)(2)).[5]
In addition, § 404.1527(d)(3) states that:
The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.... Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.
Id. Finally, the more consistent an opinion is with the record as a whole, the more weight it deserves, id. § 404.1527(d)(4), and specialists operating in their field of specialty receive more weight than those of non-specialists. Id. § 404.1527(d)(5).
*728 C.
Under these regulations, Dr. Holford surely stands alone as the source whose opinions should receive the greatest weight. He is a specialist, and his opinions are plainly based upon far more than mere recitations of subjective statements of pain: he conducted spinal surgery on Morgan, repeatedly and personally examined her and ordered, reviewed, and relied upon medical tests.[6] He monitored Morgan’s rehabilitation and prescribed pain medication for a significant period of time. Indeed, the record indicates that he saw her some 19 times — much more frequently during the time in question than any other person who submitted evidence outside of Morgan’s immediate family. In short, here Dr. Holford is uniquely positioned to provide precisely the type of “detailed, longitudinal picture” of Morgan’s medical impairments that we must value highly. Id. § 404.1527(d)(2). This long-term perspective is especially valuable in this kind of case, where a claimant proffers variable levels of pain from a severe impairment that could cause — but may not necessarily result in — debilitating, disabling pain. In such cases “snapshot” examinations are especially likely to mislead and “moving pictures” provided from records of long-term treating relationships are especially probative. To the extent that his opinion differs from the FCE — a product of a single day’s examination by a non-treating occupational therapist — the ALJ was exactly backwards; Holford’s opinions must merit more weight.[7]
Regarding the ALJ’s discounting of Dr. Holford’s medical opinions,[8] the majority claims that any error was harmless because of the FCE, which the ALJ “attempted to adopt.” Ante at -. The majority’s awkward phrasing reveals problematic reasoning and internal contradictions. The majority frankly admits that the ALJ materially misinterpreted the FCE to Morgan’s detriment. See ante pp. ---.[9] That is, the ALJ explicitly used the FCE to discount Dr. Holford’s opinions (because, in supposed contrast, it involved “actual testing”), Tr. 15, while the majority finds it sufficiently redundant with Dr. Holford’s “(assumed)” medical opinion to make discounting Dr. Holford’s opinion harmless error. Ante at -. Both propositions cannot be concurrently *729 right; in fact, both are quite wrong. The FCE’s results do overlap to some extent with Dr. Holford’s findings. But to the extent they are similar, the FCE is an entirely inadequate substitute for Dr. Holford’s medical opinions. Thus it cannot be harmless error. Moreover, the ALJ did not view the two as similar, and so at a bare minimum the remand must be accompanied with instructions to construe the FCE as fully supporting Dr. Holford’s opinions. To the extent the two differ, for the reasons I have explained above, the FCE cannot possibly trump Dr. Holford.
I would thus grant the medical opinions submitted by Dr. Holford significant, appropriate deference.
II.
The ALJ, while recognizing that “[t]he medical evidence in this case does establish the existence of a medically determinable impairment which is capable of producing” Morgan’s symptoms, Tr. 15, nonetheless did not find Morgan’s testimony of disabling pain and limited functional capacity credible. The explanation was based on:
[considering the claimant’s activities, particularly her hobbies of needlepoint, crochet, etc.; the lack of frequent emergency room visits or hospitalizations for pain; the absence of significant side-effects attributable to medication, the results of formal functional capacities evaluation in June 2001, and the opinions of Drs. Kirkley and Holford.
Tr. 16.
This explanation reveals important errors and is not supported by substantial evidence. First, it is difficult to imagine more benign and gentle hobbies than the occasional practice of needlepoint and crochet. Morgan testified that her pain varied, and that she only engaged in her hobbies “probably 45 minutes” on “a real good day” but never on a bad day. Tr. 51-52. Of course, a claimant need not be constantly bedridden or completely incapacitated to be found disabled. See Trotten v. Califano, 624 F.2d 10, 11-12 (4th Cir.1980) (“An individual does not have to be totally helpless or bedridden in order to be found disabled under the Social Security Act, otherwise, the ability to perform substantial gainful activity even one day each month or each year would disqualify an individual for benefits.” (citations omitted)); see also Waters v. Bowen, 709 F.Supp. 278, 284 (D.Mass.1989) (collecting cases where light housework and hobbies like crocheting did not disqualify claimants as disabled). Indeed, “while a claimant must show by objective evidence the existence of an underlying impairment that could cause the pain alleged, 'there need not be objective evidence of the pain itself.’” Craig v. Chater, 76 F.3d at 593 (citations omitted); see also Walker v. Bowen, 889 F.2d 47, 49 (4th Cir.1989). Here, the ALJ’s finding that needlepoint and crochet negate her testimony essentially requires Morgan to be consistently bedridden or proffer “objective evidence” of pain; it also ignores the fact that Morgan presented objective test results which her primary treating physician found fully capable of producing her disabling pain. This is error.
Also, Morgan was admitted to the emergency room more than once, and it would be passing strange to penalize a claimant for having the good sense and good fortune to receive regular treatment through specialists instead of returning to the emergency room over and over. Further, I am frankly puzzled as to how a lack of side-effects from pain medication can discount Morgan’s testimony that she is still in pain despite the medication. And, as the majority recognizes, ante at-- -, the FCE restricted Morgan by, for *730 example, stating that she could not sit or stand for more than $ of the workday-each.[10]
The ALJ’s statement that Dr. Holford’s findings somehow support that Morgan is not disabled is simply incomprehensible; no reasonable reading of his submitted evidence, as detailed above in Part I.A, can claim this. If Dr. Holford’s findings did contradict Morgan’s claims, I must wonder why Morgan would argue for us to give them such great weight? Finally, Dr. Kirkley, whatever else he wrote, specifically signed a document indicating that Morgan was unable to work indefinitely and only encouraged her to work if she felt capable. For all of these reasons, I believe that the ALJ’s decision to discount Morgan’s testimony is unsupported by substantial evidence.
III.
Finally, the majority’s novel suggestion that the ALJ discounted the evidence submitted by Morgan’s husband and daughter because of Dr. Kirkley and the FCE is unsustainable. The ALJ was crystal clear that the family members’ testimony was “viewed as biased” and given little weight simply because of their relationship to Morgan.
Morgan’s husband and daughter submitted questionnaires that indicated Morgan was able to engage in only the most limited of activities. Morgan’s husband noted that she could not do things she likes to do, such as work in the yard and house or attend movies and rummage sales. He stated that Morgan cannot bend or lift, cannot sit or stand for any long period without pain, and experiences numbness that makes walking difficult. He wrote that he must help her complete basic tasks and sometimes must help her walk or stand up. Morgan’s husband also explained that the pain has “taken away her independence. She was a very independent and active lady [and] that has all changed for her.... ” Tr. 130.
Morgan’s daughter echoed this assessment, writing that while her mother had previously been highly independent, she now “is reliant on others to perform the smallest of duties,” Tr. 132, and has difficulty standing, cooking, cleaning, getting things out of cabinets, and walking up stairs. She also wrote that Morgan cannot play -with her grandson or have him sit on her lap without pain and that she had to help her mother lay on the floor in the grocery store when her legs spasmed uncontrollably.
In direct response to this evidence, the ALJ simply stated that: “[a]s immediate family members, the claimant’s husband and her daughter would be expected to support the claimant’s effort to secure disability benefits. While I do not question the veracity of the claimant’s husband or daughter, their statements are viewed as biased and I give them little weight.” Tr. 16. In contrast to the majority’s version of things, it is perfectly clear to me that the ALJ offered no other reason for discounting this evidence and then moved on to discuss Morgan’s testimony.
*731 As with other recommendations, the magistrate judge rightly recognized that the ALJ’s per se discounting of Morgan’s family members’ observations for bias was reversible error. Courts consistently and appropriately rely on the testimony of family members in the full range of matters. As one court explained:
Descriptions of friends and family members who were in a position to observe the claimant’s symptoms and daily activities have been routinely accepted as competent evidence. Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir.1987); 20 CFR § 404.1529(c)(3). A disregard for such evidence violates the Commissioner’s regulations about observations by nonmedical sources as to how an impairment affects a claimant’s ability to work. Id. When an ALJ fails to believe lay testimony about a claimant’s allegations of pain or other symptoms, he should discuss the testimony specifically and make explicit credibility determinations. Smith v. Heckler, 735 F.2d 312, 313 (8th Cir.1984).
Behymer v. Apfel, 45 F.Supp.2d 654, 663 (N.D.Ind.1999); see also, e.g., Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir.1996) (“The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony. To the contrary, testimony from lay witnesses who see the claimant every day is of particular value; such lay witnesses will often be family members.” (citation omitted)); Regennitter v. Comm, of the Social Sec. Admin., 166 F.3d 1294, 1298 (9th Cir.1999) (noting claimant’s mother’s testimony, explaining that such lay testimony “provides an important source of information about a claimant’s impairments, and an ALJ can reject it only by giving specific reasons germane to each witness.” (citing Smolen )). As Morgan argues, if family members’ evidence was automatically worthless, it would be an odd exercise in futility to even allow them to fill out questionnaires and submit them into evidence.
IV.
For these reasons, I believe (1) Dr. Holford’s medical opinions should receive greater weight, and the evidence submitted (2) by Mrs. Morgan and (3) her family deserves proper consideration. When all of Morgan’s evidence is appropriately considered, the unavoidable conclusion is that the case should be remanded with instructions to award benefits.

. The MRI was conducted on February 9th by Dr. G. Paul Forsyth. Dr. Forsyth’s impressions from the MRI were that Morgan had bulging discs throughout the lumbar area and some joint space narrowing but no disc fragment, spinal stenosis, or nerve compression.

. Dr. Melvyn L. Haas subsequently administered electrodiagnostic studies on February 28, 2001. His impression was "SI radiculopathy, bilateral” and "early axonal neuropathy.” Tr. 166.

. On June 11, Morgan again reported to the emergency room and was given "trigger-point” injections for her back pain.

. Specifically, the cover letter to Dr. Holford from the rehabilitation center indicated that Morgan "is able to work at the 'NO CLASSIFICATION Physical Demand Level for an 8 hour day ....'” and that "[h]er specific acceptable Leg Lift capability was 0 lbs. and Torso Lift capability was 0 lbs.” Tr. 290. The letter went on to state that Morgan "exhibited minimal symptom/disability exaggeration behavior by our criteria....” Id.

. With regard to evaluating treating sources versus non-treating sources, this court has held that:
"[i]f we find that a treating source’s opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.” By negative implication, if a physician’s opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.
Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) (quoting 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)).

. The ALJ’s implicit idea that Holford never administered "actual testing” during many examinations of Morgan flatly ignores the record. Dr. Holford conducted numerous physical exams, see, e.g., Tr. 296, 298, 310, 317, and reviewed neurological exams, 299, X-ray tests, Tr. 298, 300-02, 310, MRIs, Tr. 295, 304, and nerve-conduction tests, Tr. 294.

. Dr. Holford's medical opinions are also "consistent with the record as a whole.” 20 C.F.R. § 404.1527(d)(4). Dr. Forsyth performed an MRI which revealed bulging lumbar disc material on multiple levels. Dr. Haas also diagnosed Morgan with SI radiculopathy, bilateral and early axonal neuropathy. While Dr. Kirkley did not believe that these tests provided an objective explanation and termed Morgan's lower back pain "chronic mechanical,” he also found Morgan's claims of pain sufficiently credible to remove her from work indefinitely. Moreover, Morgan testified that her pain had increased dramatically since she saw Kirkley over a year ago. Taken together, this all complicates Kirkley’s brief note sufficiently that they simply cannot count as substantial evidence to trump Holford’s medical opinions.

. I freely agree that certain of Holford’s opinion are legal opinions, which the ALJ need not accept uncritically. But I must reemphasize, in case it is not perfectly clear, that such opinions are few among many strongly supported medical opinions.

. Indeed, the ALJ did not stop there but went on and, shall we say, "attempted to” wield the FCE to discredit both Morgan and (in the majority's mind, at least) her family members. See ante at pp.---.

. More specifically, the FCE also stated that she could lift to her shoulders or carry, push, or pull only 8 pounds occasionally and 4 pounds frequently; it also noted that she could only lift overhead 3 pounds occasionally and 2 pounds frequently. Importantly, the FCE also reported that while Morgan could reach frequently, she could never bend, squat, kneel, or crawl and could not sit, stand, walk, or climb for more than 33% of a workday each. In response to Morgan's "physical demand classification,” the FCE listed "no classification.” Tr. 255. With these restrictions explicitly noted, the FCE found that Morgan’s "current work status” was "qualified full time.” Id.