Evangelist Mark **MCGRAW,**
**Sr., Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of**
**Social Security Administration,**
**Defendant.**

**No. Civ. 1:99CV111.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Dec. 29, 1999.

Joseph W. Shull, Fort Wayne, IN, for Mark McGraw, Sr, Evangelist, plaintiff.

Deborah M. Leonard, United States Attorneys Office, Fort Wayne, IN, for Social Security Administration, Kenneth S. Apfel, Commissioner, defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

This matter is before the court[1] for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying plaintiff's application for disability insurance benefits (DIB) as provided for in the Social Security Act. 42 U.S.C. § 416(i); 42 U.S.C. § 423; 42 U.S.C. § 1381. Section 205(g) of the Act provides, *inter alia,* "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g).

 The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). It is not enough for plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff,* 307 F.2d 840 (4th Cir.1962), *cert. denied,* 372 U.S. 945, 83

S.Ct. 938, 9 L.Ed.2d 970 (1963); *Garcia v. Califano,* 463 F.Supp. 1098 (N.D.Ill.1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson,* 445 F.2d 36 (7th Cir.1971); *Kutchman v. Cohen,* 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker,* 732 F.2d 605, 607 (7th Cir.1984) *citing Whitney v. Schweiker,* 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler,* 737 F.2d 714, 715 (7th Cir.1984) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971)); *see Allen v. Weinberger,* 552 F.2d 781, 784 (7th Cir.1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. § 405(g), unless there has been an error of law." *Garfield, supra* at 607; *see also Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir.1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant met the disability insured status requirements of the Act on April 7, 1995, the date the claimant stated he became unable to work, and continues to meet them through at least March 31, 2000.

2. The claimant has not engaged in any disqualifying substantial gainful activity since April 7, 1995.

3. The medical evidence establishes that the claimant has severe medically determinable symptoms suggestive of chronic fatigue syndrome, but that he does not have an impair-

---

**1.** Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all

parties consenting.

ment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints are not fully credible.

5. The claimant has the residual functional capacity to perform work related activities except for work involving lifting or carrying greater than 10 pounds frequently or lifting greater than 20 pounds occasionally (20 C.F.R. 404.1545).

6. The claimant's past relevant work as a factory worker (at the light exertional level) did not require the performance of work related activities precluded by the above limitations (20 C.F.R. 404.1565).

7. The claimant's impairments do not prevent the claimant from performing his past relevant work.

8. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. 404.1520(e)).

Based upon these findings, the ALJ determined that the plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review on August 18, 1998. This appeal followed.

The plaintiff filed his opening brief on July 2, 1999. On October 4, 1999, the defendant filed a memorandum in support of the Commissioner's decision, and on October 18, 1999, the plaintiff filed his reply. After reviewing the briefs the court ordered supplemental briefs. The Commissioner filed his supplemental brief on November 29, 1999, and the plaintiff filed his supplemental brief on December 16, 1999. Upon full review of the record in this cause, this court is of the view that the ALJ's conclusion was not supported by substantial evidence and accordingly, the Commissioner's decision will be reversed.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen,* 841 F.2d 710, 711

(7th Cir.1988); *Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen,* 855 F.2d 503, 504 n. 2 (7th Cir.1988); *Zalewski v. Heckler,* 760 F.2d 160, 162 n. 2 (7th Cir.1985); *accord Halvorsen v. Heckler,* 743 F.2d 1221 (7th Cir.1984). From the nature of the ALJ's decision to deny benefits, it is clear that step four was the determinative inquiry.

The plaintiff initially applied for DIB on October 11, 1995, which was initially disallowed by notice dated January 18, 1996 and disallowed on reconsideration by notice dated April 18, 1996. The plaintiff alleged disability due to chronic fatigue syndrome, as well as the residual effects of headaches, dizziness, and generalized weakness. The plaintiff has also complained of bronchitis, degenerative disc disease, and depression. The plaintiff requested a hearing, and on March 26, 1997, a hearing was held before ALJ Bryan J. Bernstein. The plaintiff testified at the hearing, as did his wife, Claudia McGraw, and a vocational expert (VE), Dr. Leonard Fisher. On October 24, 1997, the ALJ denied the plaintiff's claim. The plaintiff filed a timely appeal, and on February 3, 1999, the Appeals Council issued a decision upholding the ALJ's decision.

The plaintiff was 50 years old at the time of the hearing, having been born on

March 21, 1947. The plaintiff has a high school education plus two years of college. The plaintiff has worked as a Tocco operator, a construction helper, and a press operator.

The plaintiff alleges that he suffers from chronic fatigue syndrome (CFS) and depression. The plaintiff's medical history is as follows[2]. On March 23, 1990, the plaintiff was admitted to the hospital complaining of a severe pain in the neck associated with a sore throat and fever with difficulty in swallowing. An examination revealed some diffuse swelling in the right neck, anterior to the sternocelidomastoid muscle. The diagnosis was cervical adentitis. On October 12, 1993, the plaintiff reported to his family doctor, Dr. Yogesh Amin, that he was feeling dizzy, weak, tired, was vomiting, and had a cough with a cold. The plaintiff continued to report similar symptoms in 1994, and Dr. Amin sent him for another work up in August.

On August 3, 1994, the plaintiff saw Dr. Cynthia Kish, an ENT specialist, complaining of intermittent dizziness, recent upper respiratory infection, bitemporal headaches, frequent nausea and vomiting, a queasy stomach, and feeling very tired all the time. After a physical examination, Dr. Kish was not sure what the problem was and she advised a CT screening of the sinus. After the CT scan, the plaintiff continued to complain of the same problems, even though the scan did not really show any significant sinus disease.

On August 9, 1994, the plaintiff was given a treadmill exercise test and the results indicated deconditioning with rapid rise in heart rate, no arrhythmias, normal blood pressure response, and equivocal ST changes were noted suggestive of myocar-

dial ischemia. On August 12, 1994, the plaintiff saw Dr. Bhupendra K. Shah, a neurologist. The plaintiff reported headaches and dizziness, and Dr. Shah felt that they were of a tension and muscle contraction type. On August 29, 1994, an EEG was performed which was normal. An MRI of the brain was also performed on the same day, which was normal except for an area of gliosis[3]. On October 3, 1994, the plaintiff reported to Dr. Shah that his headaches and dizziness were better and that he was doing remarkably well. Dr. Shah noted the small abnormality on the MRI scan which he believed to be of no consequence.

On December 22, 1994, the plaintiff saw Dr. Shah and reported an episode of headache and double vision, and lack of energy. Dr. Shah recommended MR angiography to rule out vascular lesion. This testing was completed on February 14, 1995, and the results were normal. On April 10, 1995, the plaintiff reported having problems with a lack of energy and feeling worn out which had caused him to go home from work recently, and Dr. Shah noted that the plaintiff had been working anywhere between 46 to 72 hours per week. On April 13, 1995, the plaintiff saw Dr. Shah again and reported that he was still having a problem with chills and feeling tired but feeling a little better. Dr. Shah sent the plaintiff back to work on April 17, 1995.

On May 31, 1995, the plaintiff was seen by Dr. Suzanne Smith–Elekes, an infectious disease specialist. The plaintiff complained of chronic weakness, fatigue, nausea, headaches, dizziness and markedly decreased sex drive. Dr. Smith–Elekes noted that on April 28, 1995, the plaintiff had an EBV/IgG[4] markedly elevated at

---

**2.** Although the relevant period does not begin until April 7, 1995, the date the plaintiff met the disability insured status requirements of the Act, the plaintiff's prior medical history aids in putting all of his problems in context.

**3.** Gliosis is an overgrowth of neuralgia, the supporting tissue and framework of the nervous system (the brain and/or the spinal cord), at the expense of (i.e., displacing) the

true nerve tissue. 2 J.E. Schmidt, M.D., *Schmidt's Attorneys' Dictionary of Medicine*, G–81 (Matthew Bender 1994).

**4.** EBV is the abbreviation for Epstein–Barr Virus which is a virus similar to that causing herpes simplex, and it may be the cause of infectious mononucleosis. *Schmidt's*, at E–148. IgG is the symbol for Immunoglobulin G. or Gamma–G globulin, a type of protein com-

1:1,280. Dr. Smith–Elekes noted that the plaintiffs symptoms and findings in both the history and the laboratory data could suggest CFS, considering the plaintiff's negative medical work up. Dr. Smith–Elekes also felt that there could be a psychological component to the plaintiff's symptoms because he appeared somewhat depressed which could be impairing his sexual life. Dr. Smith–Elekes recommended a urological evaluation, an updated thyroid profile, and a PPD with anergy panel, hepatitis C, and hepatitis B, as well as HIV serologies and an immunoglobulin profile. Dr. Smith Elekes indicted that if these studies were normal and the urological evaluation was normal, then the diagnosis would most likely be chronic fatigue syndrome.

On August 2, 1995, the plaintiff saw Dr. Craig Hamilton, an urologist, and the plaintiff's exam was within normal limits. Dr. Amin followed up on the other tests, which were negative. On September 28, 1995, the plaintiff saw Dr. Shah again with recent complaints of neck pain, difficulty with balance, and feeling tired. X-rays of the cervical spine showed evidence of a large anterior osteophyte. Dr. Shah recommended an MRI scan, which was done, and on October 12, 1995, the plaintiff was informed that there was evidence of a small central disc herniation at the C3–4 level as well as degenerative changes.

On December 1, 1995, Dr. Thomas Vodde conducted a consultative psychological exam at the request of the Social Security Administration. Dr. Vodde found that the plaintiff was totally independent in his daily activities, but his lack of energy made him unable to perform any household chores or take responsibility for the management of the household. Dr. Vodde did not find any problems in the plaintiff's ability to communicate effectively, interact appropriately with others, or in his cognitive functioning. The plaintiff did have a slight impairment in the ability to focus attention and sustain concentration which Dr. Vodde thought suggested a mild difficulty completing work tasks in a timely manner. Dr. Vodde opined that all functional limitations were from his medical problems and that psychological factors were clearly secondary. Dr. Vodde diagnosed mood disorder due to a general medical condition. On December 12, 1995, a consultative physical examination was done by Dr. J.C. Schubert at the request of the Social Security Administration. Dr. Schubert noted that the plaintiff complained of chronic fatigue, had symptoms referable to his neck, but had a good range of motion of his cervical spine.

On March 13, 1996, the plaintiff was examined by Dr. William S. Wilke, Senior Medical Staff, Department of Rheumatic and Immunologic Disease, at the Cleveland Clinic Foundation. The plaintiff reported hypersomnia, no sex drive, excruciating occipital and frontal headaches, dizziness, and generalized weakness. Dr. Wilke noted elevations of IgG Epstein–Barr virus, which was a non-specific finding, and that the other tests were entirely normal. An SCL–90–R interpretive report was done which was decidedly abnormal and suggested rather severe depression (despite Prozac). Dr. Wilke diagnosed the plaintiff with fatigue and hypersomnia due to depression, and suggested a psychiatric consultation. Dr. Wilke thought that the plaintiff's severe depression was out of the range expected for someone with chronic illness, and in this case no chronic illness was apparent. Dr. Wilke opined that vigorous treatment of the plaintiff's depression would improve his symptoms.

The plaintiff started seeing Dr. Jay Patel, a psychiatrist, on March 22, 1996. The plaintiff complained of constant tiredness, dizziness, headache, constant muscle spasms, hypersomnia, no sexual desire or erection, and constant fatigue with no energy. On a Mental Status Exam, complet-

prising about 80% of human antibodies. It is the predominant immunoglobulin present in

human serum. *Schmidt's*, at I–15.

ed on August 10, 1996, Dr. Patel noted that the plaintiff looked very tired and looked as though he had gained quite a bit of body weight. Dr. Patel indicated that the plaintiff appeared depressed but did not accept that he was really depressed but was looking for a physical reason for his complaints. Dr. Patel noted that the medicines that the plaintiff had tried for his depression were either ineffective or caused side effects. Dr. Patel further opined that the plaintiff had not tried the medications long enough to see any results. Finally, Dr. Patel thought that the plaintiff might do better in a controlled environment and that a correct diagnosis might be made based on observation.

On August 11, 1996, Dr. Patel completed a Mental Impairment Questionnaire at the request of the plaintiff's attorney. On this form, Dr. Patel noted that the plaintiff had Depressive Disorder Not Otherwise Specified (NOS). Dr. Patel also noted that the plaintiff's symptoms were severe enough to interfere with attention and concentration for even simple repetitive tasks on a constant basis.

An MMPI [5] was also administered to the plaintiff. Dr. Patel reported that due to the plaintiff's test taking attitude the validity of the test was weakened as it reflected an unwillingness or inability on his part to disclose personal information. According to Dr. Patel, this overly positive self-image produces a profile that underestimates the psychological impairment. Dr. Patel further indicated that:

> The profile presents a mixed pattern of symptoms in which somatic reactions under stress is a primary difficulty. Such clients may not appear greatly anxious or depressed over their symptoms. Although sociable he seems to manage conflict by excessive denial and repression. He feels that his physical health is failing and reports numerous physical complaints. He reports a wide range of vague physical complaints that do not appear to worry him. He appears to deny and repress problems. Individuals with this profiles [sic] tend to be demanding in interpersonal relations and may attempt to control others by complaining about physical symptoms. He is likely to experience low sexual drive and as a result may experience marital problems.
>
> The profile also shows that the patient is likely to have a hysteroid adjustment to life but under stress may experience periods of elevated symptom development. Some individuals with this profile may even develop patterns of incapacitation and dependency on others. Individuals with this profile typically show a neurotic pattern of adjustment and would probably receive a clinical diagnosis of Conversion or Somatization Disorder. They might also receive an Axis II diagnosis of Dependent Personality. The clients with this profile probably resist mental health treatment, since they have little psychological insight and seek medical explanations for the disorder. They may require long term commitment to therapy before an improvement is seen but may terminate treatment early.

(Tr. 277)

The plaintiff saw Dr. James Dozier, a neurosurgeon, in late 1996 and early 1997. On examination, Dr. Dozier found limited neck range of motion and a review of the MRI scan and cervical spine x-rays indicated spontaneous fusion from C4 to C7 and degenerative changes at C3–4 which may have been causing some of the plaintiff's pain. However, Dr. Dozier recommended a conservative course of treatment.

At the request of Dr. Patel, the plaintiff was seen by Dr. Prevesh Rustagi, a psychiatrist. Dr. Rustagi noted that the plaintiff's MMPI profile was quite in keeping with his clinical presentation. In conclusion, Dr. Rustagi stated that:

---

5. The Minnesota Multiphasic Personality Inventory (MMPI) is an objective personality test which employs true-false questions that specifically limits the patient's answering options. 3b Roscoe N. Gray, M.D., *Attorney's Textbook of Medicine,* 93–76.1.

I concur with your [Dr. Patel's] diagnosis of: 1. Chronic Fatigue Syndrome. 2. Depression NOS. I would make the following suggestions for medication trials: 1. Wellbutrin. 2. Norpramin. 3. Nardil with appropriate washout. 4. A combination of Prozac with Visken (will need coordination with Dr. Amin related to his antihypertensive treatment).

This is obviously a rather complicated situation with significant history of treatment resistance. Mr. McGraw came across as a very sincere gentleman who is deeply disturbed by his illness that is not responding to treatment. I would be happy to discuss this case further with you as needed.

(Tr. 310)

At the request of the plaintiff's attorney, on March 17, 1997, Dr. Amin completed a Physical Residual Functional Questionnaire. On this form Dr. Amin diagnosed the plaintiff with headaches, neck pain, fatigue, tenderness, weakness, degenerative arthritis with disc disease, cervical spine, chronic fatigue syndrome, hypertension, and nerves. Dr. Amin noted that the plaintiff's experience of symptoms would constantly interfere with attention and concentration for even simple unskilled repetitive tasks, and that the plaintiff would be absent from work more than three times a month. In a handwritten note Dr. Amin added that "[i]t will be difficult for pt. to work due to his pain, fatigue, tiredness & extreme exhaustion with minimal activities." (Tr. 304)

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The agency has promulgated regulations that set

forth a five-step sequential process for analyzing disability claims. 20 C.F.R. §§ 404.1520, 416.920. A claimant has the joint burdens of production and persuasion through at least step four, where the individual's residual functional capacity (RFC) is determined. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. §§ 404.1545, 416.945. In the present case, the ALJ found that although the plaintiff did not retain the ability to perform his past relevant work, he was able to perform other jobs within the national economy.

 The agency's final decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that the agency findings "as to any fact, if supported by substantial evidence, shall be conclusive." "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Furthermore, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or on the [Commissioner's] designate, the ALJ)." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987) (citations omitted). This court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir.1986).

 In support of reversal of the ALJ's decision, the plaintiff first argues that the ALJ improperly rejected the opinion of the treating physician, Dr. Amin. The plaintiff points out that he saw Dr. Amin approximately 34 times since 1993 and Dr. Amin had sent him to numerous doctors for further evaluation. Moreover, Dr. Amin stated that the plaintiff had limitations which the VE acknowledges prevents the plaintiff from doing any work [6].

---

**6.** The VE testified that a hypothetical individual with the plaintiff's limitations would not be able to perform any work based upon either his inability to concentrate and pay attention or on absenteeism (more than 2 days a month off work).

Social Security requires a two-prong evaluation of the medical opinions of treating physicians. First, under what is known as the "Treating Physician Rule", the medical opinion of a treating physician must be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record. Second, if the opinion is not entitled to controlling weight, such opinion is still entitled to deference and must be weighed using the factors set out in the regulations [7]. The regulations also provide that "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." [8]

With respect to Dr. Amin's opinion, the ALJ stated:

> The claimant's treating physician's [sic] Dr. Amin, expressed the opinion that the claimant is totally disabled and incapable of performing any job related activities (Exhibits 28 and 37). He has noted that, the claimant would not even be able to maintain the attention and concentration necessary for even simple unskilled repetitive tasks (Exhibits 41 and 48). However, this assertion is simply not supported by the totality of evidence.
>
> Other physicians, such as Dr. Smith–Elekes, seem more willing to admit that chronic fatigue syndrome is a "non-diagnosis"; a condition when there is no evidence of anything wrong. For example, she cites the claimant's "negative work-up" as evidence of chronic fatigue syndrome (Exhibit 26, Page 4). Additionally, the picture is clouded by the fact that the claimant has been taking hypertrophic [sic] and other medications on an irregular basis, usually with no positive effect. Moreover, Dr. Amin admits that it is really difficult to observe a patient's symptomatology when only seeing such patient periodically in an office setting (Exhibit 41, Page 3). Therefore, Dr. Admin's [sic] conclusions of disability are not persuasive.
>
> The claimant's account of his activities of daily living is also unconvincing. The claimant displayed a self-indulgent attitude at the hearing. He had declined to set exercise goals and while admitting that Dr. Admin [sic] had encouraged this. Moreover, the record reflects that the claimant's wife works, and that he has received substantial disability or sick pay, thus indicating a lack of financial incentive to return to work (Exhibit 38). The claimant alleges that he used to work seven days per week (80 hours). Now he alleges that he spends as much as a month at a time in bed, while his wife takes care of the house. Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to explain that degree of limitation with the claimant's medical condition, in view of the relatively weak medical evidence and other factors discussed in this decision. The claimant's report of limited daily activities is considered to be outweighed by the other factors discussed in this decision.

(Tr. 20).[9]

---

7. 20 C.F.R. § 404.1527(d) provides, "Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we will consider all of the following factors in deciding the weight we will give to any medical opinion." The factors cited include: length of treatment relationship and frequency of examination; nature and extent of the treatment relationship; supportability (i.e., medical signs and laboratory findings); specialization; and other factors.

8. 20 C.F.R. § 404.1527(d)(2).

9. The plaintiff has pointed out two errors in the ALJ's decision. First, the plaintiff was taking psychotropic medication and not hypertrophic medication. Second, Dr. Patel

The plaintiff first argues that the ALJ's characterization of Dr. Smith–Elekes' diagnosis and opinion is incorrect and shows a gross misunderstanding of CFS and its diagnosis. Specifically, the plaintiff objects to the ALJ's finding that Dr. Smith–Elekes stated that CFS is a "nondiagnosis" and that it is a "condition when there is no evidence of anything wrong." This court has carefully reviewed Dr. Smith–Elekes' medical opinion. Dr. Smith–Elekes opined that the plaintiff's symptoms and laboratory results "may suggest chronic fatigue syndrome given his negative medical workup." (Tr. 175) Dr. Smith–Elekes also recommended more testing and then stated: "If all of these studies are normal and his urological evaluation is normal, at that point, I would agree that he most likely has chronic fatigue syndrome." (*Id.*) The parties apparently agree that CFS is a "collection of symptoms" and is not diagnosed through any series of tests but is diagnosed after ruling out other impairments. Nevertheless, it is clear that CFS is *not* a "condition when there is no evidence of anything wrong". Rather, CFS is a condition where something is definitely wrong, but the doctors do not know how to specifically test for or treat the condition.

In any event, the Commissioner has acknowledged that the ALJ found that the plaintiff had provided objective medical evidence supporting the *diagnosis* of CFS and that the ALJ adopted the physicians' opinions about the plaintiff's diagnoses[10]. However, the Commissioner asserts that the ALJ did not accept the plaintiff's treating physicians' opinions about the *severity* of the plaintiff's symptoms (fatigue and pain), because their opinions on this issue were necessarily based on the plaintiff's subjective statements, and the ALJ found that the plaintiff's statements were not credible[11].

The plaintiff also objects to the ALJ's statement that "the picture is clouded because Mr. McGraw was taking hypertrophic and other medications on an irregular basis, usually with no positive effect." The plaintiff asserts that this comment is vague and rather incomprehensible (and a misstatement of the record, see footnote 9). The Commissioner has taken the position that the ALJ was deciding "that the physicians' disability opinions were undercut by the fact that plaintiff took his prescribed medication only irregularly (Tr. 20)."[12] The Commissioner contends that Dr. Patel stated that he prescribed the plaintiff various medications, but the plaintiff would not try them long enough to see any results. Dr. Patel did in fact state that: "I have tried Prozac, Zoloft, Elavil, and Ritalin and all four medications have been stopped for one reason or another. He has not tried these medications long enough to see any results." (Tr. 266). The plaintiff suggests that Dr. Patel had prescribed the medications for the plaintiff's depression and not his CFS, and argues that there are no definitive treatments for CFS. The plaintiff also points out that Dr. Amin, who was treating the plaintiff's CFS, indicated that "Overall, [the plaintiff] has responded poorly to the treatment in spite of compliance with medications and treatment as recommended." (Tr. 259). The Commissioner, however, asserts that (according to the 1999 edition of the *Merck Manual*) antidepressants are the most successful treatment for CFS and provide improvement in eighty-percent of patients and, thus, the ALJ could reasonably conclude that if the plaintiff's symptoms were as severe as contended, he would have given the medicine more of a chance to work.

The plaintiff objects to the use of the 1999 edition of the *Merck Manual*, as that edition clearly was not in publication at the

and not Dr. Amin stated that it was difficult to observe the plaintiff's symptoms because he was only seen in the office periodically. *See* Tr. 267.

10. Defendant Sur–Reply Brief at 1.

11. *Id.*

12. Memorandum in Support of the Commissioner's Decision at 12.

time of the plaintiff's hearing. The previous edition of the *Merck Manual* was published in 1992, and does not state that antidepressant treatment improved CFS patients' symptoms. In his sur-reply, the Commissioner claims that he merely cited the *Merck Manual* "in response to plaintiff's unsubstantiated assertion that there is no treatment for CFS." [13] In any event, the Commissioner states that he has never asserted that the use of medication would have alleviated the plaintiff's symptoms, but was only pointing out that if the plaintiff were as plagued by fatigue and pain as he alleged, one would expect he would have taken his medication long enough to see if it helped.

There are several problems with the Commissioner's arguments. First, The ALJ's decision on this issue is unclear, and no amount of filling in the gaps with what "one would expect" makes the decision any clearer. Second, the ALJ did not explain why the plaintiff's irregular use of medication "clouded the picture", as the ALJ does not explain his basis for believing that the plaintiff should have continued to take medication (if, in fact, that was the ALJ's belief). Third, there is no evidence that the plaintiff was ever urged to continue the medications for longer periods of time to see if they would work. Rather, it appears that the plaintiff was prescribed medication to see if it would work, and after a few days with no change, the plaintiff stopped the medication. Since there is no evidence that anyone ever told the plaintiff that CFS sufferers often found relief with a particular type of medicine, it seems unreasonable to expect the plaintiff to have continued taking medicine that wasn't helping him. In fact, as noted, Dr. Amin felt that the plaintiff had fully complied with "medication and treatments as recommended."

The plaintiff also asserts that the ALJ failed to engage in the mandatory analysis concerning what weight should be granted the opinions of treating physicians. The plaintiff claims that the ALJ did not properly weigh the opinion of Dr. Amin by considering the nature and extent of his treatment of the plaintiff. The plaintiff points out that Dr. Amin has seen him nearly once a month since his problems began in October of 1993, yet the ALJ did not explain how this unique perspective is outweighed by other factors. The Commissioner, however, characterizes the ALJ's reasoning as thus: a reasonable conclusion is that Dr. Amin's opinion was based nearly exclusively on the plaintiff's subjective complaints, the ALJ did not find the plaintiff's subjective complaints credible, therefore Dr. Amin's opinion may be rejected *in toto*.

The Social Security Regulations state:

Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed below, as well as the factors in paragraphs (d)(3) through (5) of this section in determining the weight to give the opinion.

20 C.F.R. § 404.1527(d)(1).

The plaintiff contends that the ALJ committed an error of law in not weighing all the factors set out in the regulations and then explaining what weight he gave to the opinion of Dr. Amin based on these

13. Sur–Reply Brief at 6.

factors. The plaintiff concludes that if Dr. Amin's opinion were credited, a finding of disabled would be mandated.

Social Security Ruling 82–53 states that "[t]hose aspects of the disability determination that relate to the nature, extent and duration of the impairment must be based on medical facts (*i.e.*, symptoms, signs, and laboratory findings)." In this case, Dr. Amin, a treating physician drew conclusions about the nature, extent, and duration of the plaintiff's impairment based upon the plaintiff's symptoms, signs, and laboratory findings. Specifically, Dr. Amin found that the plaintiff is disabled and cannot function in a work environment.

In his decision, the ALJ focused on the fact that a diagnosis of CFS arises when a doctor cannot determine what is the matter with his patient. However, there is no evidence that doctors routinely assign a CFS diagnosis when patients have an inexplicable set of symptoms. Nor is there any evidence that treating physicians simply accept all the subjective complaints of their patients when assigning a CFS diagnosis. Rather, CFS has specific symptoms, of which the plaintiff repeatedly complained. Moreover, the plaintiff also had laboratory findings of positive EBV test and an abnormal MRI scan of the brain. Both of these findings are mentioned in SSR 99–2p as factors that help establish the existence of CFS. Thus, the evidence shows that Dr. Amin did not necessarily rely only on the subjective complaints of the plaintiff in determining that the plaintiff was disabled.

Since the ALJ did not give any reasons why the laboratory findings do not constitute substantial medical evidence about the plaintiff's condition, or why he concluded that Dr. Amin based his opinion on the plaintiff's subjective complaints, this court finds that the ALJ failed to properly explain his rejection of Dr. Amin's opinion. *Micus v. Bowen*, 979 F.2d 602, 609 (7th cir.1992) (ALJ may not blithely reject a treating physician's opinion; the ALJ's

findings must be supported by substantial evidence).

■ The plaintiff also claims that the ALJ failed to articulate any reasons for rejecting the opinion of Dr. Patel, a treating psychiatrist. Dr. Patel opined that the plaintiff's symptoms were severe enough to interfere with attention and concentration for even simple repetitive tasks on a constant basis. The VE testified that such a limitation would prevent an individual from doing any work. The plaintiff points out that although the ALJ mentions Dr. Patel, he does not give any reason for rejecting his opinion.

■ The Commissioner argues that the ALJ noted that Dr. Patel felt that the plaintiff had not taken his medications long enough for them to do any good, and that it was difficult to observe the plaintiff's symptoms in an office setting. However, a review of the ALJ's decision leaves one with the impression that the ALJ did not even fully realize that he was discussing Dr. Patel's opinion. Rather, the ALJ only discussed Dr. Amin's opinion, although the ALJ mistakenly credited Dr. Amin with portions of Dr. Patel's opinion. Clearly, irrespective of whatever the Commissioner now believes the ALJ intended to say in his decision, the ALJ did not cite any specific reasons for rejecting the opinion of Dr. Patel, who was the plaintiff's treating psychiatrist. An ALJ has a duty to "minimally articulate" reasons for rejecting evidence favorable to the plaintiff from a treating or examining psychologist or psychiatrist. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir.1996); *Stein v. Sullivan*, 892 F.2d 43, 47 (7th Cir.1989). In the present case, it is clear that the ALJ failed to perform his duty.

■ The plaintiff also contends that the ALJ improperly evaluated his subjective complaints. The ALJ discredited the plaintiff's subjective complaints because his "account of his activities of daily living is also unconvincing", the plaintiff "displayed a self-indulgent attitude at the

hearing", the plaintiff "had declined to set exercise goals and while admitting that Dr. Admin [sic] had encouraged this", "the record reflects that the claimant's wife works, and that he has received substantial disability or sick pay, thus indicating a lack of financial incentive to return to work" (Tr. 20). The ALJ further discredited the plaintiff's description of his daily activities because the "limited activities cannot be objectively verified with any reasonable degree of certainty" and "it is difficult to explain that degree of limitation with the claimant's medical condition, in view of the relatively weak medical evidence and other factors discussed in this decision". (*Id.*)

■ The parties agree that the court should defer to the ALJ's credibility determination because the ALJ had the opportunity to observe the plaintiff and his wife. *See Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 541 (7th Cir.1992). An ALJ's credibility determination will not be disturbed unless it is patently wrong. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir.1994); *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.1995). "However, when such [credibility] determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Herron, supra*, 19 F.3d at 335 (quoted in *Baran v. Chater*, 1996 WL 616219, 99 F.3d 1142 (7th Cir.1996)).

With respect to the "self-indulgent attitude" and exercise goals, the testimony of record is as follows:

Q. How much exercise do you do?

A. As much as I can.

Q. Well, I mean, did they put you on some kind of regiment where they want you out in the morning and walk for an hour?

A. I—no. He told—I exercise my neck because of the arthritis. Her and I, we were exercising one day and walked down the block, and I was about a block-and-a-half, two blocks, and she wanted to go around. When we was at the house, she wanted to go around oh, about five, six blocks and I couldn't make it. I had to turn around, so I'm figuring four blocks because I barely made it home, so we had about four blocks. I—

Q. You have been trying to do a little bit at a time and gradually expand that.

A. Yes, sir. I have.

Q. Okay. How far have you gotten?

A. Four blocks.

Q. How often do you do that?

A. As much as possible. When I—

Q. Do you do it on a daily basis?

A. No, I can't. I don't do it on a daily basis because I never know—I do it whenever I'm feeling good.

* * * * * *

Q. Have your doctors prescribed regular exercise? Have they told you to go out and walk around the house? That's all you do for the next month, every day, do that.

A. They told me—Dr. Mean [Amin?] told me to do what I can without, you know, passing out or something, you know, and that's what I've been doing.

(Tr. 51–52, 57).

The transcript simply does not show any hint of a self-indulgent attitude on the part of the plaintiff, nor does it show that he refused to set exercise goals despite Dr. Amin's encouragement to do so. While the Commissioner argues that the plaintiff's testimony supports an inference that Dr. Amin recommended a regular exercise program, this court fails to see such an inference. According to the plaintiff, Dr. Amin told him to "do what he could" and that is what the plaintiff did. Additionally, the ALJ ignored Dr. Amin's statement that the plaintiff had followed all recommended treatment for his CFS. Thus, this court finds that the ALJ's conclusion that the plaintiff had a self-indulgent attitude and refused to follow a recommended exer-

cise regime is not supported by the evidence.

With respect to the ALJ's reliance on the fact that the plaintiff had no financial incentive to return to work, the plaintiff argues that this factor is fairly neutral, as all persons have a financial incentive to receive disability payments. Moreover, in the present case, the plaintiff was making a significant income when he worked, as he normally worked seven days a week. The plaintiff further testified that he liked the work he was doing, and liked the people he worked with. Several doctors commented that the plaintiff desired to go back to work. Additionally, the record shows that the plaintiff did not partake of other activities he enjoyed, such as fishing, because he simply did not have the energy. The court finds that the ALJ's reliance on the plaintiff's supposed financial motives are not supported by the evidence.

The Commissioner argues that the plaintiff's statements that he had no activities was contradicted by his statement that, on a good day, he was active for five hours. The plaintiff's testimony regarding his activities on a good day is as follows:

Q. Well, do you have good days and bad days, days in which you are able to do stuff?

A. Yes. Yesterday was a good day for me.

Q. What did you do?

A. I went to the doctor with her [plaintiff's wife].

Q. She went to her doctor?

A. Yes.

Q. All right. Did you drive?

A. I drove yesterday.

Q. Did you go shopping?

A. No, we don't go out that far.

Q. Did you go out to eat?

A. Not yesterday. She came home and cooked and I stayed in the kitchen with her, and then, you know, I started getting tired, so this is basically five hours.

Q. Five hours what?

A. I had a good day for five hours. Then I started feeling tired, ran out of steam. I ran out of steam, but I wasn't dizzy or nauseous. I just had my headache. I have my headaches constantly. That's—I go to bed with them, I wake up with them.

(Tr. 54, 55).

The court fails to see how, as the Commissioner alleges, the above evidence suggests that the plaintiff was not forthcoming about his activities. While the plaintiff states that he was "active" for five hours, the activity level during that five hours was markedly limited, as it basically consisted of driving to a doctor's office, waiting for his wife to be seen by the doctor, driving home, and sitting in the kitchen with his wife until he started feeling too tired to sit up any longer. Additionally, with respect to the ALJ's finding that the plaintiff's daily activities cannot be objectively verified with any reasonable degree of certainty, the plaintiff points out that this court has recently rejected this line of reasoning in *Behymer v. Apfel*, 45 F.Supp.2d 654, 662 (N.D.Ind.1999). The Commissioner has failed to respond to the plaintiff's argument on this point and the court finds the plaintiff's point well-taken. The ALJ's determination of the plaintiff's credibility regarding his daily activities is not supported by the evidence and is patently wrong.

The plaintiff has requested that the ALJ's decision be reversed and an order entered requiring that benefits be paid as opposed to a remand for further proceedings. It is appropriate for this court to reverse and award benefits when a remand for additional fact finding would serve no useful purpose. *Lindner v. Sullivan*, 902 F.2d 1263, 1267 (7th Cir.1990). In this case, substantial evidence does not support the ALJ's denial of benefits and the plaintiff has provided the opinions of two treating physicians that he is disabled. Additionally, the testimony of the plaintiff and the plaintiff's wife supports the plaintiff's

allegation of disability. Therefore, the decision of the ALJ will be reversed and remanded for the payment of benefits. *Micus v. Bowen,* 979 F.2d 602, 609 (7th Cir.1992).

### Conclusion

For all of the foregoing reasons, the decision of the ALJ is hereby REVERSED and this case is REMANDED FOR PAYMENT OF BENEFITS.