Patricia J. WATES, Plaintiff,

v.

Jo Anne BARNHART, Commissioner of
the Social Security Administration,
Defendant.

No. 02–C–324.

United States District Court,
E.D. Wisconsin.

June 30, 2003.

Ronald B. Eskin, for Plaintiff.

Jennie Lehman, Penelope Fleming, Milwaukee, WI, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Patricia Wates brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of defendant Jo Anne Barnhart, Commissioner of the Social Security Administration ("defendant" or "the Commissioner"), denying her application for disability benefits under the Social Security Act. The action was assigned for pretrial purposes to Magistrate Judge

William E. Callahan, Jr., who recommended that the decision be affirmed. Plaintiff objected to the recommendation, and the matter is now before me for decision.

## I. DISABILITY STANDARD

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security regulations prescribe a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520; 416.920. Under this test, the Administration must determine: (1) whether the claimant is presently unemployed; (2) if so, whether the claimant has a severe impairment or combination of impairments; (3) whether any of the claimant's impairments are listed by the Social Security Administration as being so severe as to preclude substantial gainful activity;[1] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform her past work; and (5) if not, whether the claimant is able to perform any other work in the national economy in light of her age, education and work experience. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.2000); *Rucker v. Chater,* 92 F.3d 492, 494 (7th Cir.1996).

A claimant will automatically be found disabled if she makes the requisite showing at steps one through three. *See Henderson ex rel. Henderson v. Apfel,* 179 F.3d 507, 512 n. 3 (7th Cir.1999). If the claimant is unable to satisfy step three, she must then demonstrate that she lacks the RFC to perform her past work. *Id.* If she makes this showing, the burden shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. *Id.* The Commissioner may carry this burden either by relying on the testimony of a vocational expert, who evaluates the claimant's ability to perform work in the national economy in light of her limitations, or through the use of the "Medical–Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. pt. 404, subpt. P, app. 2. *See Heckler v. Campbell,* 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). The Grid is a chart that classifies a person as disabled or not disabled based on her physical ability, age, education, and work experience. *See Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987); *see also Heckler,* 461 U.S. at 461–62, 103 S.Ct. 1952; *Caldarulo v. Bowen,* 857 F.2d 410, 413 (7th Cir.1988). However, the Commissioner may not rely on the Grid if the person's attributes do not correspond precisely to a particular rule, *see Caldarulo,* 857 F.2d at 413, or if non-exertional limitations (e.g., pain, or mental, sensory or skin impairments) might substantially reduce the claimant's range of work, *see Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001) (citing *Luna v. Shalala,* 22 F.3d 687, 691 (7th Cir.1994)). In such a case, the Commissioner must solicit the testimony of a vocational expert, *Herron v. Shalala,* 19 F.3d 329, 337 (7th Cir.1994), although she may use the Grid as a "framework" for making a decision, *see* 20 C.F.R. § 404, Subpt. P, App. 2, § 200.00(e)(2).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application

Plaintiff applied for disability benefits on September 3, 1999, claiming that she had been unable to work since February 16, 1999 due to depression, anxiety, stomach

---

1. These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings").

pain related to ulcers and a hiatal hernia, and reflux disease. (Tr. at 79, 92.) Her claim was rejected initially on January 27, 2000 on the ground that she had no severe impairment. (Tr. at 60, 109.) Plaintiff requested reconsideration on March 15, 2000, indicating that she was still under a doctor's care for anxiety and depression, and suffered from reflux disease, ulcers and bowel problems. (Tr. at 65.) However, she was again denied benefits on August 11, 2000 (Tr. at 66), this time because the Administration determined that there was other work she could perform (Tr. at 128). Plaintiff then requested a hearing (Tr. 71), and on September 4, 2001 she appeared before Administrative Law Judge ("ALJ") Marsha Stroup.

**B. Hearing Testimony**

Plaintiff and vocational expert ("VE") Victoria Rei were the only witnesses at the hearing. Plaintiff was represented by counsel.

**1. Plaintiff's Testimony**

Plaintiff testified that she was forty-five years old and lived with her husband, mother, and two children—ages eight and nine. (Tr. at 32, 33.) She was a high school graduate and had taken some college courses. (Tr. at 33.) She stated that she last worked as a fermentation tech, a position she held from 1997 to 1999. She indicated that the position required her to put together the materials to ferment the basis for drugs. (Tr. at 33.) From 1989 to 1997 plaintiff worked as a secretary, and before that as an insurance agent. (Tr. at 34.)

Plaintiff testified that she suffered from a variety of medical problems that precluded her from working. She had heel spurs, which prevented her from standing for very long, although she had obtained shoe inserts which made the problem more tolerable. (Tr. at 39.) She suffered from depression and anxiety, which affected her memory. (Tr. at 40.) She had problems with her back, legs, and feet when she walked related to rheumatoid arthritis in her lower back. (Tr. at 42.) She stated that she also suffered pain in her back when she sat too long. (Tr. at 43.) She stated that she also suffered from fibromyalgia, which caused daily pain all over her body. (Tr. at 42–43.) She testified that she experienced problems with reflux, although medication helped. (Tr. at 52.)

Plaintiff stated that due to her health problems she did very little around the house; neighborhood boys cut the grass, although she did some weeding in the garden. (Tr. at 40.) Plaintiff testified that she no longer cooked because she could not remember what to do and became upset and frustrated. (Tr. at 43–44.) Her mother and husband did the cooking. She testified that she would vacuum once in a while, but experienced pain in her arms when doing so. (Tr. at 44.) She indicated that she went grocery shopping with her husband about once a month, but would go during the middle of the week when few people were present. She indicated that she did not carry the groceries and that her husband pushed the cart. (Tr. at 41–42.)

Plaintiff testified that when she felt pain she would lay on the couch or sit back on a recliner with her feet up and cover herself. She indicated that her husband bought her a tanning bed that she used several times a week to keep her muscles warm, which gave her some relief. (Tr. at 45.) She indicated that she sat in the recliner with her feet up most of the day because if she was on her feet too long her ankles swelled up and she felt pain in her back and legs. (Tr. at 45.) She stated that she slept about ten hours per night and took a one or two hour nap during the day. (Tr. at 51.)

Plaintiff testified that she rarely drove, socialized, or participated in her children's activities at school due to her mental conditions. (Tr. at 40.) She indicated that she got nervous around people, experiencing anxiety attacks. (Tr. at 50.) During such attacks she would have trouble breathing and experience chest pain. (Tr. at 50.) She also indicated that she had trouble controlling her emotions when driving or disciplining her children. (Tr. at 50–51.) Plaintiff indicated that while she had a driver's license she rarely drove because she experienced anxiety and "road rage." (Tr. at 35.) Her husband typically did the driving. (Tr. at 35.) Plaintiff testified that because of problems with concentration she had a hard time reading and coming up with words during conversation. (Tr. at 49.) Her husband and she did the check book together because she messed it up when she tried to do it alone. (Tr. at 49.)

Plaintiff testified that she could walk about 700 feet and stand in one spot for maybe five or ten minutes. (Tr. at 47.) She indicated that her back and hip hurt from sitting in the chair in the waiting room at the hearing office. (Tr. at 47–48.) She indicated that the most she could lift was a container of milk but that she could not carry it very far. (Tr. at 48.)

Plaintiff indicated that she was currently taking a variety of medications, including Prozac, Ativan, Neurontin, Prevacid, Ritalin, Dolobid, and Wellbutrin. (Tr. at 36–37.) She indicated that she experienced weight gain and headaches as side effects of the medication. (Tr. at 46.) She testified that she saw her primary care physician, Dr. McCreary, every two months, and her psychiatrist, Dr. Baker, every two weeks. (Tr. at 38.)

### 2. VE Testimony

VE Rei testified that plaintiff's past work as a fermentation tech was classified as medium, semi-skilled work. (Tr. at 53.) The secretarial position involved light, semi-skilled work; and the insurance agent position was light, skilled work. (Tr. at 53.) The ALJ then had the following colloquy with the VE:

Q Okay. She's obviously has got some prior employment history that I could consider as far as something to go back to. I think what I want you to focus in on is light and sedentary work, I've divided between the two but look at unskilled, less stressful kinds of jobs, maybe wouldn't require as much concentration and are quite as intense as what she had before? Do you use Milwaukee and the United States as your base?

A Yes, I did and I also eliminated public contact because of—

Q That's probably–yes–

A So if you–

Q Okay.

A I mean if you want me to put those back in then I will go to some others.

Q No, I agree, no public contact and unskilled, low stress work.

(Tr. at 53–54.)

Using these parameters, the VE concluded that plaintiff could perform various jobs that were available in the national economy and locally, including addresser, bench hand assembler, and electronics assembler. (Tr. at 54.) She indicated that an absenteeism rate of one day every month in such positions is borderline; one day every two months is acceptable. (Tr. at 55.) She further testified that even though these are low stress jobs one must maintain pace and accuracy. (Tr. at 55.) Finally, she indicated that these sorts of jobs are quite regimented and additional breaks are not tolerated. (Tr. at 55.)

## C. Medical Evidence

The ALJ received medical records and reports from plaintiff's primary care physician, Dr. McCreary, and her psychiatrist, Dr. Baker, as well as the reports of several consulting physicians.

### 1. Dr. McCreary

Dr. McCreary's notes begin in February 1999, when plaintiff was seen for bronchitis. (Tr. at 145.) In March 1999 she began complaining of nausea, diarrhea, stomach pain and reflux symptoms, which rendered her unable to work.[2] (Tr. at 316–17.) Dr. McCreary ordered an ultrasound of plaintiff's gallbladder, which revealed gallstones, and an upper GI, which revealed a hiatal hernia and a small duodenal diverticula. (Tr. at 147–48, 151, 161, 162.) Plaintiff had her gallbladder removed on April 22, 1999 (Tr. at 148), and was released to return to work on May 8, 1999 (Tr. at 192).

On May 28, 1999 plaintiff returned to Dr. McCreary and noted that her stomach felt better after the surgery, but that she had been depressed for the past six weeks. (Tr. at 150.) She indicated that she had been experiencing stress at work related to a problem supervisor. (Tr. at 150.) Dr. McCreary referred her to Dr. Baker for psychiatric treatment. (Tr. at 150.)

Dr. McCreary's notes then skip to November 9, 1999, at which time plaintiff indicated that she had been experiencing pain in her legs and hip, mostly at night, for the past three months. Dr. McCreary prescribed rest, heat treatment, and use of Celebrex, and continuation of her treatment with Dr. Baker. (Tr. at 313.) Dr. McCreary's December 14, 1999 note indicated that plaintiff's medication was helping to relieve the pain in her hip and back. He also indicated that Dr. Baker had re-cently changed plaintiff's medication for depression, which seemed to be helping. (Tr. at 312.)

Dr. McCreary's February 7, 2000 note indicated that plaintiff was suffering from depression, eczema, gastritis, myalgia, osteoarthritis, plantar fascitis, and reflux esophagitis. (Tr. at 250.) She complained of aching pain all over and indicated that her prescribed medication was not working. (Tr. at 250.)

Plaintiff returned to Dr. McCreary on March 6, 2000 and was noted to have the same list of maladies, but appeared "more calm and alert." (Tr. at 249.) When seen on April 4, 2000, Dr. McCreary noted a positive test for rheumatoid arthritis. (Tr. at 248.) A May 2, 2000 note indicated that plaintiff's medication for fibromyalgia had been increased. Plaintiff stated that she did not feel pain when immobile but that she hurt with any muscle use. (Tr. at 247.)

Dr. McCreary's June 23, 2000 note indicated that plaintiff's muscle aches and pains were improved. Plaintiff also noted that her depression was better, though the anxiety was still there. (Tr. at 246.) Dr. McCreary's August 23, 2000 note indicated that plaintiff still "aches all over." (Tr. at 306.) He again noted that her depression was better but there was "still some anxiety present." (Tr. at 306.) Her muscles were very sore and she needed "something more." (Tr. at 306.) The November 2, 2000 note indicated that Dr. Baker had increased plaintiff's medication and that she had started to exercise three times per week. (Tr. at 304.) Her depression seemed better, though she was experiencing increased fatigue. (Tr. at 304.) Plaintiff saw Dr. McCreary again on February 2, 2001 and was noted to be unable to work

---

**2.** Plaintiff was also seen by Dr. Jupa on March 19, 1999 at the request of her then-employer. (Tr. at 184.) Dr. Jupa diagnosed gastritis and dyspepsia and indicated that she could return to work. (Tr. at 184–85.)

because of "emotional issues." (Tr. at 303.) She was trying to exercise daily to keep her strength up. (Tr. at 303.)

Dr. McCreary's March 2, 2001 note indicated that plaintiff was still having a good deal of pain, which was chronic and severely limiting her activities. (Tr. at 276.) He indicated that she was also emotionally impaired regarding working. Her physical activities were severely limited by her fibromyalgia. He indicated that her prognosis was very guarded, and that she was unable to work. (Tr. at 276.)

Dr. McCreary completed a report dated April 1, 2001, in which he indicated that plaintiff suffered from fibromyalgia, had a history of widespread pain, and experienced fatigue of sufficient severity to significantly interfere with full-time work. (Tr. at 273.)

### 2. Dr. Baker

Dr. Baker's treatment notes are handwritten and difficult to read. It appears that plaintiff began treatment with him on June 8, 1999 and saw him once or twice per month. (Tr. at 198–212.) Dr. Baker completed a series of mental health assessment progress reports for Kemper Insurance, which apparently provided disability insurance coverage to plaintiff's employer. In those reports, he indicated that plaintiff suffered from depression and generalized anxiety, and that she had a Global Assessment of Functioning (GAF) score of 40. (Tr. at 213.) According to the DSM–IV, someone with this score has a "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man . . . is unable to work . . .)."[3] *Diagnostic and Statistical Manual of Mental Disorders—Fourth Edition* 34 (2000) [hereafter "DSM–IV"].

Dr. Baker also completed a mental residual functional capacity assessment dated January 16, 2001, in which he indicated that plaintiff was markedly limited in all areas save two. (Tr. at 279–80.) He completed another report dated January 16, 2001, in which he indicated that plaintiff suffered recurrent, severe panic attacks. (Tr. at 340.) He also completed a "rating of impairment severity form" containing the "B" criteria of the Listings of mental impairments in which he indicated that plaintiff had marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; constant deficiencies in concentration, persistence and pace; and continual episodes of deterioration in a work-like setting. (Tr. at 341.)

### 3. Consultative Exams

On December 6, 1999, plaintiff was evaluated by Dr. Nichols at the behest of the Administration. Dr. Nichols opined that plaintiff suffered from generalized anxiety disorder, panic disorder, depressive disorder, and had a GAF of 50. (Tr. at 230–33.) According to the DSM–IV, such a score reflects a serious impairment in occupational functioning. *DSM–IV* at 34.

On January 21, 2000, Dr. Matkom completed a psychiatric review technique form for the Administration, in which he indicated that plaintiff had no severe impairment. (Tr. at 235.) He wrote that she suffered from generalized anxiety, but had no more than slight limitations in functioning. (Tr. at 242.)

On July 31, 2000, Dr. Warrior completed a psychiatric review technique form, in which she indicated that plaintiff suffered from an effective disorder and an anxiety related disorder (Tr. at 257), but neither were severe enough to meet the Listings

---

**3.** Plaintiff was also examined by Dr. Egan at Kemper's behest, and he concluded that she was "totally disabled for any occupation from a mental standpoint." (Tr. at 222.)

(Tr. at 264). Dr. Warrior also completed a mental residual functional capacity assessment, in which she found that plaintiff was not significantly limited in most areas of functioning but moderately in a few. (Tr. at 266–67.)

### D. ALJ's Decision

On September 28, 2001, the ALJ issued a decision denying plaintiff's claim. (Tr. at 11–21.) The ALJ concluded that plaintiff suffered from several severe impairments, including heel spurs, reflux disease, fibromyalgia, osteoarthritis, and anxiety and depression. (Tr. at 15.) However, she found that none of these impairments met or equaled any of the Listings. (Tr. at 15.) She acknowledged that plaintiff's treating physician had opined that plaintiff met Listing 12.06 ("anxiety related disorders"), but opinions on issues reserved to the Commissioner, such as whether the claimant was disabled or met the Listings, are not entitled to controlling weight under applicable social security regulations. (Tr. at 15.) The ALJ stated that the treating physicians' opinions were "generally consistent with the record as a whole," (Tr. at 16), yet credited the opinions of the agency physicians that plaintiff's condition(s) did not meet or equal any of the Listings. (Tr. at 16.)

The ALJ then determined that plaintiff retained the RFC to sit six hours and stand or walk not more than two hours in an eight hour day; lift, carry, push and pull less than ten pounds frequently and no more than ten pounds occasionally; and was limited to performing simple, low stress work involving no contact with the public. (Tr. at 16.) Therefore, she found that plaintiff had the RFC to perform "a slightly limited range of sedentary work." (Tr. at 16.) In reaching that conclusion,

she professed to give "significant weight" to the statements of Drs. McCreary and Baker. (Tr. at 16.)

Based on this RFC, the ALJ determined that plaintiff could not perform her past relevant work as a fermentation operator, secretary, or insurance agent. (Tr. at 19.) However, based on the testimony of the VE, the ALJ found that there were jobs in the national economy that plaintiff could perform. (Tr. at 20.) Therefore, using Grid Rule 201.21 as a framework for her decision,[4] the ALJ concluded that plaintiff was not disabled. (Tr. at 20.)

### E. Appeals Council and District Court Review

Plaintiff sought review from the Appeals Council (Tr. at 6–7), but the Council declined to disturb the ALJ's decision, making it the final decision of the Administration (Tr. at 4–5). Plaintiff then commenced this action for judicial review of the ALJ's decision. (R. 1.) She urged three bases for reversal. First, plaintiff argued that the ALJ failed to adequately support the RFC findings with medical evidence, and that while the ALJ claimed to afford significant weight to the opinions of plaintiff's doctors, she adopted findings plainly at odds with those opinions. Second, plaintiff argued that the ALJ failed to adequately consider her testimony regarding her symptoms. Finally, plaintiff argued that the ALJ failed to pose a proper hypothetical question to the VE, rendering the VE's testimony unreliable. She asked for a judicial award of benefits or, in the alternative, a remand for further proceedings. (R. 6.) The magistrate judge rejected these contentions and recommended that the ALJ's decision be affirmed. (R. 11.) Plaintiff timely objected

---

4. Rule 201.21 of the Medical–Vocational Guidelines, 20 C.F.R. Part 404, Subpt. P, App. 2, provides that a "younger individual" who can perform the full range of sedentary work and has a twelfth-grade education is not disabled

(R. 12), and the matter is before me for decision.

## III. APPLICABLE STANDARDS OF REVIEW

### A. Magistrate's Recommendation

■ Where a party timely objects to a magistrate judge's recommendation, I conduct a de novo review of the objected-to portions, 28 U.S.C. § 636(b)(1); *see United States v. Raddatz,* 447 U.S. 667, 673–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); and may review de novo any other aspects as I see fit, *see Delgado v. Bowen,* 782 F.2d 79, 81–82 (7th Cir.1986). Because plaintiff has timely objected, I will conduct a de novo review.

### B. ALJ's Decision

■ Under 42 U.S.C. § 405(g) a district court may affirm, modify or reverse an ALJ's decision,[5] with or without remanding the case for a rehearing. However, review of the decision is limited, and the ALJ's findings must be upheld if supported by substantial evidence. *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable mind would accept as adequate to support a conclusion. *See Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. *Young v. Sec'y of Health & Human Servs.,* 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review " 'must be more than an uncritical rubber stamp.' " *Delgado,* 782 F.2d at 82 (quoting *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984)).

■ Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir.2000); *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Binion,* 108 F.3d at 782.

■ If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The ALJ's decision must also demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). While the ALJ need not discuss every piece of evidence in the record, she must provide at least a glimpse into her reasoning. *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001). "Even if enough evidence exists in the record to support the decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.' " *Hodes v. Apfel,* 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)). Finally, "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 970.

---

5. Because the Appeals Council denied review of plaintiff's case, the ALJ's decision became the final decision of the Commissioner. *Her-* ron, 19 F.3d at 332 (citing 20 C.F.R. § 404.981).

## IV. DISCUSSION

Upon review of the record and the parties' submissions, it appears that this appeal presents three issues for judicial review. First, did the ALJ properly evaluate the opinions of plaintiff's treating physicians, and, in light of that evaluation, were the ALJ's findings regarding the Listings and RFC adequately explained and supported by substantial evidence? Second, did the ALJ properly evaluate plaintiff's credibility? And third, did the ALJ elicit reliable testimony from the VE? I address each in turn.

### A. Evaluation of Treating Source Opinions, RFC, and the Listings

■ Treating source opinions must be given special consideration in social security cases. *Dominguese v. Massanari*, 172 F.Supp.2d 1087, 1100 (E.D.Wis.2001). If well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence, the adjudicator must afford such opinions controlling weight. *Id.* (citing SSR 96–8p). Even if the ALJ finds that the opinion does not warrant controlling weight, the ALJ may not simply reject the opinion. SSR 96–2p. Rather, she must evaluate the opinion's weight by looking at the length, nature and extent of the plaintiff's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p. Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always "give good reasons" for her decision. 20 C.F.R.

§ 404.1527(d)(2). And while an ALJ need not award benefits "simply because a physician finds that the claimant is 'disabled' or 'unable to work,'" *Clifford*, 227 F.3d at 870; *see also* SSR 96–2p; the ALJ still must consider such an opinion under the standards discussed above. *See Schwartz v. Halter*, 134 F.Supp.2d 640, 650 (E.D.Pa. 2001); *see also* SSR 96–5p.

In the present case, the ALJ stated: "Dr. McCreary's and Dr. Baker's opinions with regard to the claimant's residual functional capacity are generally consistent with the record as a whole and supports [sic] the undersigned's finding of residual functional capacity as stated above." (Tr. at 16.) The ALJ further stated that in making her findings she had "given significant weight to the medical source statements of the claimant's treating physicians, Dr. McCreary and Dr. Baker." (Tr. at 16.) But clearly she did not do so.

Dr. Baker opined that plaintiff was markedly limited in virtually every area on the mental RFC assessment he completed. (Tr. at 279–80.) He further opined that plaintiff had marked restrictions in the activities of daily living; marked difficulties in maintaining social functioning; constant deficiencies of concentration, persistence or pace; and continual episodes of deterioration or decompensation in a work like setting.[6] (Tr. at 341.) Yet the ALJ concluded that plaintiff had only slight restrictions in the activities of daily living; moderate difficulties in social functioning; slight limitations in concentration, persistence or pace; and no limitations in a work like setting. (Tr. at 18.) She also seemed to determine that the only limitation relevant to plaintiff's mental RFC was limited contact with the public.

Dr. McCreary opined that plaintiff suffered from fatigue of sufficient severity to

---

6. These are the "B criteria" in Listings 12.04 and 12.06.

significantly interfere with a full-time work schedule. (Tr. at 273.) He further stated that her pain was

> chronic and severely limiting her activities. . . . Her physical activities are severely limited by her fibromyalgia. Minimal activities cause pain. Simple repetitive movements of the hands cause her a good deal of pain and [render her] unable to continue them (including crocheting). Hips and feet bother her greatly and make it very difficult for her to sit or walk other than short segments.

(Tr. at 276.) Dr. McCreary also opined that plaintiff would require breaks due to fatigue and would incur frequent work absences because of her fibromyalgia. (Tr. at 56.) Yet the ALJ found that plaintiff could sit six hours and stand or walk two hours out of an eight hour day; and lift, carry, push and pull up to ten pounds frequently and more than ten pounds occasionally. Implicitly, she found that plaintiff could work a full, eight hour day, on a consistent basis. (Tr. at 16.) She never explained how plaintiff could perform such work in light of her need for breaks, which the VE testified would not be tolerated in a sedentary job. (Tr. at 55.)

■ Because the ALJ failed to explain how her findings could be squared with the contrary opinions of plaintiff's treating doctors, which she claimed to afford "significant weight," she did not "give good reasons" for her decision. 20 C.F.R. § 404.1527(d)(2). Further, the ALJ failed to build an accurate and logical bridge from the medical evidence to her conclusions, precluding meaningful judicial review. *See, e.g., Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001); *Groves v. Apfel,* 148 F.3d 809, 811 (7th Cir.1998). Even if there is sufficient evidence in the record to support the ALJ's findings (and even if the ALJ could properly credit the opinions of the state agency physicians over plaintiff's treating physicians), these

are errors of law that require reversal and remand. *See Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir.2002) ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").

It is true, as the ALJ noted, that controlling weight must not be given to treating source opinions on issues reserved to the Commissioner, such as whether the claimant is disabled, meets a Listing, or is able to perform past work. *See* SSR 96–2p. Therefore, the ALJ did not err by refusing to adopt Drs. McCreary's and Baker's ultimate conclusions that plaintiff was disabled. Where she did err, however, was in failing to explain why she made findings at odds with the treating source opinions. Far from providing "good reasons," the ALJ seemed not to even notice the conflict, claiming that she gave these opinions significant weight when, in light of her findings, that was not possible.

Therefore, the Commissioner's decision must be reversed and remanded for re-evaluation of the treating sources' opinions. *See, e.g., Miller v. Barnhart,* 43 Fed.Appx. 200, 203–04 (10th Cir.2002) (reversing where ALJ ignored treating source opinions regarding plaintiff's mental impairments, even though they were not entitled to controlling weight because they dealt with issues reserved to the Commissioner); *Holohan v. Massanari,* 246 F.3d 1195, 1202–08 (9th Cir.2001) (reversing where ALJ failed to provide proper reasons for rejecting treating source opinions); *Herbert v. Barnhart,* No. 00–2417, 2002 WL 31180762, at *6, 2002 U.S. Dist. LEXIS 18615, at *17–18 (D.Kan. Sept. 19, 2002) (reversing where ALJ's reasons for giving little weight to treating source were either illegitimate or unsup-

ported by the record); *Raub v. Barnhart*, No. 01–C–8283, 2002 WL 1793744, at *8, 2002 U.S. Dist. LEXIS 14252, at *25–26 (N.D.Ill. Aug. 2, 2002) (remanding where ALJ failed to provide explanation for why he accorded lesser weight to treating physicians than state agency physicians); *Credit v. Barnhart,* No. 01–C–9406, 2002 WL 1732370, at *2–3, 2002 U.S. Dist. LEXIS 13489, at *8–9 (N.D.Ill. Jul.25, 2002) (reversing where "the lack of reasoned explanation for implicitly disregarding the assessments of the treating physician did not meet the minimal articulation standard"); *Sherman v. Barnhart,* No. 01CV–192, 2001 U.S. Dist. LEXIS 21210, at *17 (N.D.Tex. Dec. 19, 2001) (recommending remand for clarification where ALJ sent mixed signals about weight afforded treating source); *Schwartz,* 134 F.Supp.2d at 652–53 (remanding where ALJ failed to properly explain why he refused to give controlling weight to treating source opinion); *Pagan v. Apfel,* 99 F.Supp.2d 407, 411 (S.D.N.Y.2000) (remanding so ALJ could explicitly articulate why he adopted finding of reviewing agency physician on plaintiff's mental impairment over that of treating source); *McGraw v. Apfel,* 87 F.Supp.2d 845, 856 (N.D.Ind.1999) (reversing where ALJ failed to minimally articulate reason for rejecting opinion of treating psychiatrist).

■ Following her re-evaluation of the weight to be afforded the treating source opinions, the ALJ will also have to reconsider her findings on the Listings and RFC. Disability claims based on mental disorders are evaluated in essentially the same manner as claims based on physical impairments. If the mental impairment is severe, the ALJ must determine whether it meets or equals any of the Listings. The Listings of mental impairments typically consist of three sets of "criteria": the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to perform substantial gainful activity (SGA). If a claimant satisfies the A and B, or A and C criteria, she will be considered disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.

In the present case, the ALJ determined that plaintiff did not satisfy the B criteria of Listings 12.04 and 12.06. (Tr. at 18.) However, Dr. Baker opined that plaintiff was sufficiently limited to meet the B criteria for Listings 12.04 and 12.06. (Tr. at 341.) As noted, the ALJ need not give controlling weight to a treating source opinion that the claimant meets a Listing. However, the ALJ may not ignore the medical findings underlying such a conclusion, even if—fully credited—such findings would compel a conclusion that the claimant is disabled. *See Schwartz,* 134 F.Supp.2d at 650. Therefore, following re-evaluation of the weight to be afforded Dr. Baker's opinion, the ALJ must re-assess whether plaintiff meets Listings 12.04 and 12.06.

Should the ALJ determine on re-evaluation that plaintiff does not meet Listings 12.04 and 12.06, the inquiry cannot end there. Even if the claimant's impairment does not meet or equal a Listing, the claimant still may not have the mental RFC to perform SGA. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00; 20 C.F.R. § 404.1520a(c)(3). "The determination of mental RFC is crucial to the evaluation of [the claimant's] capacity to do SGA when [her] impairment(s) does not meet or equal the criteria of the listings, but is nevertheless severe." § 12.00. The RFC assessment

"complements the functional evaluation necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders." *Id.* According to SSR 85–16, Residual Functional Capacity For Mental Impairments:

> this evaluation includes consideration of the ability to understand, to carry out and remember instructions and to respond appropriately to supervision, co-workers, and customary work pressures in a work setting. Consideration of these factors, which are contained in section 12.00 of the Listing of Impairments in Appendix 1, is required for the proper evaluation of the severity of mental impairments.
>
> The determination of mental RFC involves the consideration of evidence, such as:
>
> - History, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of hallucinations, delusions or paranoid tendencies; depression or elation; confusion or disorientation; conversion symptoms or phobias; psychophysiological symptoms, withdrawn or bizarre behavior; anxiety or tension.
> - Reports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior.
> - Reports from workshops, group homes, or similar assistive entities.
>
> In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individual's strengths and weaknesses. Consideration should be given to factors such as:
>
> - Quality of daily activities, both in occupational and social spheres (see Listing 12.00, Introduction), as well as of the individual's actions with respect to a medical examination.
> - Ability to sustain activities, interests, and relate to others over a period of time. The frequency, appropriateness, and independence of the activities must also be considered (see PPS No. 96, SSR 83–15, Titles II and XVI: Evaluation of Chronic Mental Impairments).
> - Level of intellectual functioning.
> - Ability to function in a work-like situation.

SSR 85–16; *see also* 20 C.F.R. § 404.1545(c) (stating that ALJ must assess the mental abilities of "understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting").

In the present case, Dr. Baker opined that plaintiff's mental RFC was severely limited. (Tr. at 279–80.) The ALJ did not engage in an explicit evaluation of plaintiff's mental RFC, finding only that she could perform simple, low stress work involving no contact with the public. (Tr. at 16.) Ignored were Dr. Baker's findings that plaintiff was markedly limited in the ability to understand, remember, and carry out work instructions, maintain attention and concentration for extended periods, and accept instructions and respond appropriately to supervisors. (Tr. at 279–80.) Given the VE's testimony that even in low stress jobs one must maintain pace and accuracy (Tr. at 55), this is critical evidence which must be properly evaluated.

Perhaps on remand the ALJ will conclude that these restrictions on mental RFC do not exist; but in her current decision she found that Dr. Baker's opin-

ions were supported by the evidence. If so, plaintiff's RFC may preclude SGA. *See Miller,* 43 Fed.Appx. at 204 (reversing where ALJ made no express finding regarding plaintiff's mental RFC, even though the record documented that plaintiff's mental impairments, which the ALJ accepted as true, drastically limited his ability to get along with people, accept supervision, and hold a job). This issue must be considered on remand.

## B. Evaluation of Plaintiff's Testimony

▇▇▇ The court must defer to the ALJ's credibility determinations because the ALJ had the opportunity to personally observe the plaintiff at the hearing. *McGraw,* 87 F.Supp.2d at 857 (citing *Ehrhart v. Sec'y of Health & Human Servs.,* 969 F.2d 534, 541 (7th Cir.1992)). An ALJ's determination of the claimant's credibility should 'not be disturbed unless it is patently wrong. *Id.* (citing *Diaz,* 55 F.3d at 308; *Herron,* 19 F.3d at 335). However, when the ALJ's credibility determination rests on objective factors rather than subjective considerations such as a claimant's demeanor, appellate courts have greater freedom to review the ALJ's decision. *Clifford,* 227 F.3d at 872. Further, the court need not defer to a credibility determination based on a misstatement or misunderstanding of the evidence. *See Sarchet,* 78 F.3d at 307–08. Finally, in evaluating a claimant's credibility, the ALJ must abide by the Commissioner's regulations and rulings. For example:

> In evaluating a claimant's subjective complaints of pain, the ALJ must first determine whether the pain alleged is substantiated by objective medical evidence. 20 C.F.R. § 404.1529. If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's

daily activities by directing specific inquiries about the pain and its effects to the claimant. Social Security Ruling 88–13, ("SSR 88–13"). She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. SSR 88–13. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. SSR 88–13; *Pope[ v. Shalala],* 998 F.2d [473] at 485–86 [(7th Cir.1993)]. *See also Jones v. Shalala,* 10 F.3d 522, 525 (7th Cir. 1993).

*Luna,* 22 at 687.

▇▇▇ In the present case, plaintiff argues that the ALJ failed to conduct a proper analysis of her subjective allegations of pain and incorrectly dismissed her complaints because they were not supported by objective medical findings. She notes that much of her pain is related to fibromyalgia, which does not produce "objectively discernible symptoms." *Sarchet,* 78 F.3d at 307; *see also* 20 C.F.R. § 404.1529; SSR 96–7p.

The ALJ's evaluation of plaintiff's credibility was as follows:

> The undersigned finds the credibility of the claimant's testimony to be only fair based on her demeanor as the hearing. In determining the limitation to the claimant's functional capacity, the undersigned has carefully considered the entire record, including the claimant's testimony. Based on testimony, the claimant is able to provide for most of her personal needs. While she states that she does not like large groups of people, she is able to go grocery shop-

ping. These activities along with infrequent doctor visits and medical treatment as noted by the record, indicate the claimant's alleged impairments are not of such severity as to preclude work activity. Therefore, due to these inconsistencies, the undersigned cannot find the claimant's allegations that she is incapable of all work activity to be credible and adopts the aforementioned residual functional capacity. (Tr. at 19.)

There are several problems with this discussion. First, it is unclear how testimony that plaintiff is able to provide for "most of her personal needs" casts doubt on her testimony that she is unable to work.[7] There is no requirement in social security law that a person be unable to feed, groom, bath or dress herself in order to be disabled.[8] Nor does the ability to perform some basic household tasks mean that a person is not disabled. As the Seventh Circuit stated in *Clifford:*

> Clifford testified that her typical household chores took her only about two hours to complete. Clifford indicated that she had to rest while doing household chores. She stated that she cooks, but only simple meals. She also indicated that she could vacuum, but it hurts her back. She stated that she goes grocery shopping about three times a month and "sometimes" carries groceries from the car to the apartment. She further stated that she could lift a twenty pound sack of potatoes, but she "wouldn't carry it long." Clifford testified that her husband helps her with the household chores whenever possible.

While she babysits her grandchildren, she indicated that her depression is aggravated while watching them. In regard to walking, Clifford stated that she walked to get exercise at her doctor's suggestion. However, she stated that she must rest after walking anywhere between three and five blocks. Clifford further indicated that she plays cards (two rounds) about twice a month. Thus, her testimony on her daily activities does not undermine or contradict her claim of disabling pain.

227 F.3d at 872; *see Dominguese,* 172 F.Supp.2d at 1098–99 (rejecting ALJ's determination that plaintiff's complaints were exaggerated based on plaintiff's ability to perform some light household tasks, where such tasks were not necessarily consistent with ability to work or plaintiff's complaints); *see also Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir.1993) (ruling that the ALJ may not rely on minimal daily activities as substantial evidence that claimant does not suffer disabling pain).

Second, the ALJ's reliance on the fact that plaintiff goes grocery shopping to prove that plaintiff is able to tolerate contact with people ignores the fact that plaintiff testified that she went shopping during the middle of the week, with her husband, when few people were in the store. *See Dominguese,* 172 F.Supp.2d at 1098–99 (rejecting ALJ's credibility determination where ALJ ignored plaintiff's other testimony regarding what she could not do).

Third, the ALJ stated that plaintiff's doctor visits were "infrequent," but she

---

7. The ALJ did not specify what she meant by "personal needs" but presumably was referring to things like grooming, bathing, etc.

8. Social Security regulations list several activities—such as cleaning, shopping, cooking, taking public transportation, and maintaining a residence—as activities of daily living that the ALJ must consider in assessing mental impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. Plaintiff testified that she was unable to cook because she forgot what she was doing; could only shop when the store was nearly empty and her husband accompanied her; did very little cleaning; and that she and her husband balanced the check book together because she messed it up when working alone.

failed to cite any medical support for that conclusion. Indeed, there was no evidence as to how often someone with plaintiff's conditions should reasonably see her physician. Based on my review of the record, it appears that plaintiff saw her medical doctor about every month or two and her psychiatrist twice per month. It is unclear how this renders plaintiff's testimony suspect. *See id.* at 1096 ("[T]he record contains no medical evidence concerning how regularly or how often a patient experiencing plaintiff's stated level of pain related to fibromyalgia and plaintiff's other afflictions would be expected to see a doctor. In the absence of such evidence, the ALJ made his own independent medical determination about the appropriateness of doctor visits. This determination was not within the ALJ's province to make.").[9]

Finally, although the ALJ seemed, interspersed throughout the decision, to discuss evidence linked to most of the factors set forth in SSR 96–7p,[10] she did not effectively tie those statements to her credibility determination. Under SSR 96–7p:

> the evaluation must contain "specific reasons" for a credibility finding; the ALJ may not simply "recite the factors that are described in the regulations." SSR 96–7p. Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of

how the applicant's testimony is weighed.

*Steele,* 290 F.3d at 942.

Therefore, for all of these reasons, the matter must be reversed and remanded for reconsideration of the credibility of plaintiff's testimony.

## C. VE Testimony

 "Hypothetical questions posed to vocational experts ordinarily must include all limitations supported by medical evidence in the record." *Steele,* 290 F.3d at 942. This does not mean that every limitation alleged by the claimant must be included—only those supported by the evidence. *Ehrhart,* 969 F.2d at 540.

In the present case, the ALJ asked the VE to consider low stress jobs that involved no public contact. However, she did not factor in any limitations plaintiff may have regarding contact with co-workers or supervisors; nor did she factor in limitations in concentration, persistence and pace.[11] Thus, although the court need not remand in search of the perfect hypothetical question—especially where the claimant's mental limitations are somewhat nuanced—when additional errors undermine the court's confidence in the ALJ's decision, remand is appropriate for this

9. "Even assuming that the evidence warranted the ALJ's conclusion that plaintiff's doctor visits were intermittent or infrequent, the ALJ should not have drawn an adverse inference with respect to her credibility without making additional inquiry [under SSR 96–7p.]" *Id.* at 1097. SSR 96–7p provides:

> The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

> The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.

10. *See* Magistrate's Recommendation [R. 11] at 12–14.

11. Recall that Dr. Baker opined that plaintiff had "constant deficiencies in concentration, persistence and pace," (Tr. at 341), and was "markedly limited" in the ability to accept instructions from and respond appropriately to supervisors (Tr. at 280).

purpose as well. As the Seventh Circuit stated in *Steele:*

> [N]othing in the record reflects that the vocational expert independently knew of all the limitations related to Steele's depression that were omitted by the ALJ. True, the vocational expert testified at length about how bouts of hostility brought on by Steele's depression might affect his vocational profile. And it is also true that the jobs identified for Steele to work (such as housekeeper and security guard) might not demand levels of sociability or concentration beyond his capabilities. *See Donahue v. Barnhart,* 279 F.3d 441, 444 (7th Cir.2002). So our misgivings about this problem are not acute. But given the other difficulties in the case, we mention the ALJ's incompletely formed hypothetical questions as well.

290 F.3d at 942.

## V. CONCLUSION

 Plaintiff requests that the ALJ's decision either be reversed with a finding that she is disabled or remanded for further proceedings. An immediate award of benefits is appropriate only if the record is fully developed and the outcome certain. *See Campbell v. Shalala,* 988 F.2d 741, 744 (7th Cir.1993). In the present case, there is some evidence in the record supporting the Commissioner's conclusions. For instance, the state agency reviewing physicians reached conclusions contrary to those of plaintiff's doctors. I cannot conclude that the entire record compels a conclusion that plaintiff is disabled. Therefore, the matter must be remanded.

On remand, the ALJ must (1) re-evaluate the weight to be afforded the opinions of plaintiff's treating physicians, and, in light of that re-evaluation, whether plaintiff meets or equals any of the Listings, and plaintiff's mental and physical RFC; (2) plaintiff's credibility in light of SSR 96–7p; and (3) obtain further testimony from the VE in light of the full range of plaintiff's mental limitations.

Therefore, I decline to follow the recommendation of the magistrate judge; and

**IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and this case is **REMANDED** to the Commissioner for further proceedings consistent with this decision, pursuant to 42 U.S.C. § 405(g), sentence four.